ELLA B. LUTZ et al., Appellees, v. LEWIS A. BILLICK et al., Appellants.

**PARTNERSHIP: The Relation — Evidence — Manner of Handling Property.** On the question whether a partnership existed and whether certain property was partnership property, it is pertinent to show (a) the manner in which the property was operated, (b) how the alleged partners participated in such operations, and (c) what disposition was made of the profits.

**PARTNERSHIP: The Relation—Profits and Losses—Presumption from Sharing Profits.** An agreement to share losses is clearly presumed or implied from an agreement to share profits.

**PARTNERSHIP: Property of Firm—Property in Name of One Partner—Resulting Trusts.** A resulting trust in favor of all the partners of a partnership arises from the buying of real estate for partnership purposes and on partnership account, and the vesting of the title to the same in the name of one of the partners.

**PARTNERSHIP: The Relation—Evidence—Sufficiency to Establish.** Evidence reviewed, and held sufficient to show that a partnership existed between deceased and his brother, and that certain land, to which deceased held title, was partnership property.

*Appeal from Louisa District Court.*—HON. OSCAR HALE,
Judge.

MONDAY, NOVEMBER 22, 1915.

SUIT in partition was consolidated with an action by the administrator to sell, and resulted in a decree as prayed. Lewis A. Billick, who claimed to own an undivided one half of the land, appeals.—*Modified* and *Remanded*.

*Courts & Tomlinson* and *Blake & Wilson,* for appellants.

*Weaver, Briggs & Erwin* and *Molesberry & Reany,* for appellees.

LADD, J.—J. J. Billick died seized of 240 acres of land and leaving him surviving a widow, Susan A. Billick, who died in 1899, and five sons and one daughter. Of the sons, Seef Billick remained single, and died in 1897. Freed Billick departed this life in 1910, leaving him surviving five children and four grandchildren by a deceased daughter. T. J., or Jefferson, Billick died January 1, 1913, at the age of 65 years. Lewis A. Billick was born in 1872 and, therefore, was fifteen years old at the time of his father's death. The plaintiff, Ella Billick, married Frank Lutz, February 14, 1900, and had lived on the premises up to that time. James H. Billick is still living. At the time of the death of T. J. Billick, title to about 450 acres of land stood in his name, and in this suit the plaintiffs pray for the partition of said land. Lewis A. Billick, by way of cross-petition, alleged that he was joint owner of said premises with deceased, T. J. Billick; that he and the deceased entered into an oral agreement about the year 1889, under the terms of which they were to "take over and acquire all the land of which their father, James J. Billick, died seized; that they should work together jointly, cultivate the land and engage in the business of farming and stock raising together, and by their joint efforts and the proceeds of such business pay all of the debts, claims and incumbrances against the estate and the lands of which their father died seized, and in that way, acquire said lands and own them together in equal shares"; that, in pursuance of said agree-

ment, they did carry on the farm by raising stock and culti-
vating the soil until the death of said T. J. Billick, and from
the proceeds paid all of the debts and claims against the estate
of their father, including incumbrances thereon, and acquired
title to said lands and, out of the proceeds of said business,
acquired the other real estate; that, as a matter of convenience,
title was taken in the name of T. J. Billick and he held the
same in trust for himself and Lewis; that all of said lands
were paid for out of partnership funds under the foregoing
arrangement, and defendant, Lewis A. Billick, prayed that his
ownership of an undivided one half thereof be decreed. This
claim was put in issue. There was also an application for
the sale of the land in order to pay claims against the estate,
and this was consolidated with the first mentioned suit.

From this statement, it is apparent that the main issue is
whether the land was acquired as averred by Lewis A. Bil-
lick. The contention as to one tract may be disposed of at the
outset. Title to the S. E. ¼ N. W. ¼ and S. W. ¼ N. E. ¼
of Section 13 in Township 76 was acquired by T. J. Billick
January 21, 1879, or about eight years prior to the death of
J. J. Billick, and by him retained until his death. Whatever
may have been the subsequent arrangement, it could not have
entered into the purchase or payment of the purchase price of
this 80 acres. Title to the S. W. ¼ of Section 13 and the E.
½ of the S. E. ¼ of Section 14 was obtained by deceased from
the administrator of his father's estate. Of the other land, he
acquired title to 80 acres in 1899, and to other portions of the
farm in 1901, 1902 and 1911. In other words, all the land ex-
cept 80 acres, deeded to him in 1879, was acquired and title
taken in the name of T. J. Billick after his father's death. The
indebtedness of J. J. Billick at that time equaled, if it did not
exceed, the value of the estate, and the theory of the plaintiff
is that shortly after his father's death, T. J. Billick, who was
then unmarried and 39 years of age, proposed to his brother,
Lewis A. Billick, then a little over 15 years old, that they
operate the farm together and out of the profits pay the debts

of the estate and acquire the land; and that they would share alike in the property so obtained.

An examination of the record has convinced us that such an agreement was entered into and fully performed. As the testimony of neither party is available, death having closed the mouth of one and the law that of the other, we necessarily must revert to what deceased may have said with reference thereto in connection with other proved facts. He appears to have talked freely to his neighbors concerning the arrangement with his brother, and what he said leaves no doubt that, shortly after his father's death and before title was acquired to any of this land, he proposed to Lewis that, if he would join him in handling and working the farm left by his father, they would acquire title thereto and each should have an equal share therein; that Lewis accepted the proposition and that, during all the years following, they continued on the land under this arrangement, and out of the profits derived from its use and their joint labors and enterprise, paid whatever was expended in acquiring title and improving the land. Lewis did most of the work on the farm and Jefferson transacted most of the business—practically all of it prior to Lewis' attaining majority. Later, Lewis was consulted in business matters, such as leasing portions of the farm, and he appears to have been in charge of disposing of watermelons, to the raising of which the land seems to have been adapted. Evidence of the manner of operating the farm—how each participated, and the disposition of the profits—was pertinent to the inquiry as to whether the brothers were copartners and, if so, when they became such. *Illinois Malleable Iron Co. v. Reed*, 102 Iowa 538. The crucial test is whether they intended to become such. Profits certainly were contemplated, for the purpose was to acquire the title to the land through the payment of debts and incumbrances against it, but nothing was said of sharing losses. This was

1. PARTNERSHIP: the relation: evidence: manner of handling property.

2. PARTNERSHIP: the relation: profits and losses: presumption from sharing profits.

clearly to be implied from their undertaking to share profits, the nature of the enterprise and their relation thereto. *Johnson Bros. v. Carter & Company*, 120 Iowa 355; *Richards v. Grinnell*, 63 Iowa 44. See *Heard v. Wilder*, 81 Iowa 421; *Irwin v. Cooper*, 111 Iowa 728, 731.

If there was a partnership, then, and the land was purchased with the money or property belonging thereto and title taken in the name of one partner, the law is well settled

**3. PARTNERSHIP: property of firm: property in name of one partner: resulting trusts.** that a resulting trust arose in favor of the firm. *Paige v. Paige,* 71 Iowa 318; *Kringle v. Rhomberg*, 120 Iowa 472. The principle, tersely and accurately stated, found in 2 Story Eq. (13th Ed.), Sec. 1207, is quoted with approval in *Paige v. Paige, supra:* "Where real estate is purchased for partnership purposes, and on partnership account, it is wholly *immaterial,* in the view of a court of equity, *in whose name or names the purchase is made* and the *conveyance taken,*— whether in the name of *one* partner, or of all partners; whether in the name of a stranger alone, or a stranger jointly with one partner. In all these cases, let the *legal* title be vested in whom it may, it is in equity deemed partnership property, not subject to survivorship, and the partners are deemed the *cestuis que trust* therefor."

A partnership is treated in law as a distinct and separate entity, and the purchase of property in the name of one of its members or of a stranger, with partnership property, raises a resulting trust in its favor precisely as though an individual's property had been made use of for that purpose. *In re Estate of Mahin,* 161 Iowa 459; *Amidon v. Snouffer,* 139 Iowa 159, and cases cited therein; *Culp v. Price,* 107 Iowa 133, 135. See *Western Securities Co. v. Atlee,* 168 Iowa 650.

The theory of appellant is that a partnership was entered into and money belonging thereto was paid for the land, and if so, deceased held same in trust for such partnership

and Lewis should be decreed entitled to an undivided one half thereof.

The relationship of the parties in what was done appears from what T. J. Billick is shown to have repeatedly declared and never to have denied. About 10 years before his death, he said to Stingley, in response to an inquiry as to " 'How are you and the boys making it?' 'Well, we have got through this far and I believe we will make it. I told the kid (meaning Lewis) if he would stay with me, we could pull through. I told Lew if he would stay with me, I would guarantee that he would get as much out of this deal as I did, and he agreed to do it, and if he stays, I believe we can get out on top after awhile, but it is going to be a pretty hard pull.' He did not mention the land."

4. PARTNERSHIP: the relation: evidence: sufficiency to establish.

Gerard testified that, after the father's death, Jefferson and Lewis did the farming; that it was pretty hard to tell which was boss; that, in response to the question, "What are you going to do with Lew, your brother?" Jefferson answered that he promised Lew that, if he would stay there and help him pay out, he would divide equally with him; "told me that he and Lewis were in partnership on the place. Jeff refused to rent me land until he saw Lew. When we talked about this partnership, we were talking about the Billick land. He said they were in partnership in farming and not partners in anything else that I know of and did not always consult Lew before renting." In September, 1912, he (Jefferson) was asked by one Taylor as to who owned the place, and responded: "Why Lew and I own it together. It is as much mine as Lew's." He stated that he had assumed the debt when his father died and got the deed and had taken Lew, his unmarried brother, with him if he would stay, to share one half with him and do the work on the place. He would look after the business operations and Lewis would look after the work, and work together and share half the real estate and everything with him. The witness also testi-

fied that he had said that Lew, being a minor, could not own real estate, but that if he would stay with him, he would make an oral contract that one half would be his; that he would share one half the real estate and everything with him; and that Lew had stayed with him. To Hall, he had said, about 3 years prior to his death, that he and Lew were in partnership and that he would have to talk with Lew before arranging to rent the land, but 10 years previous, he had rented from Jeff alone; that the talk about partnership was in a conversation about the crops. He told John Thornton, a neighbor, that ''he had told Lew that if he would stay there and help him out, in time he would give him equal share of the farm'', and had said several times that ''Lew had just as much interest there as he had; was just as much interested as he was.'' It seems that Thornton inferred from this that they inherited equally. He had told Dr. Hetrick, a veterinary surgeon and an intimate friend, while out fishing with him, that when his father died, the place was badly involved, and the others thought it would not pay out and they all left; that he told Lew, ''You just keep a stiff upper lip and stay with me and we will take care of this place and work what we can and try to pay out and you shall own one half and I one half and it shall be known as the Billick Bros.''; that he said to him, as he was going to the hospital, that when he came back, he would have his will made. One Beck testified that he had said to him that the property would not have brought what it was worth if it had been sold to pay the indebtedness, and that it was in his name because Lewis could not get money and make mortgages, owing to being a minor; and on being asked why he did not put it in Lewis' name after he attained majority, said that he just allowed it to run along that way, as Lewis was satisfied that everything would come out all right and the heirs had all agreed that there was nothing there; that another time he had said that they were partners half and half and repeatedly had told him that they were partners in the land and everything there; that the partner-

ship had started "right after their father died"; that Jeff had said to Lew: "I had better put it in my name so I could run on with the business"; that he told him this arrangement was made right after his father's death; that he had kept the land in his own name, because he did not know whether they would get along as well after Lew married as before. O'Connor testified that he had come to him to borrow some money, and to the inquiry "What does Lew own up there?" answered: "He owns just as much as I do; we are partners in everything"; that at that time, he was trying to get a loan on the land. Rowe testified that Jeff had told him that things belonged to Lewis the same as they did to him and that they were working together; that, shortly before his death, he went to the hospital at Muscatine to see Jeff and asked him to deed the half of the land to Lewis, "If he thought it justly his". I said to him: "Jeff, don't you consider that Lewis has an equal right in that property over there as you have? 'Why,' he says, 'He has, yes.' I said to him 'Then won't you deed half of this land to him?' He said, 'No, I won't deed half of the land to him.' I said: 'If you think Lew is entitled to it, I would like to have Lew get his share of it if you will do it. If you won't do it, for G—'s sake, why? Won't you tell me why you won't?' 'Well,' he says, 'I will. If I deed one half of this land to Lew now, I can't go back there and live; there will be no living with Maud if I do that.' He alluded to Lew's wife. 'I will do it sometime, but I am not going to die; sometime I will fix the thing.' "

To Poyneer, he spoke of the condition of the property, and told him that he had said to Lew: "If you will stay right here with me, we will take hold of this thing and work it out and pay the indebtedness and we will own it together", and expressed his pride that they had been successful in paying off the indebtedness and spoke in the most kindly terms of his brother and explained that, as Lewis was a minor, he had taken charge in so far as the title to the property was con-

cerned, and that they owned the property together. He told DeFord that they were partners in everything. He said to Holland that Lew owned half of the farm. He stated to George Cline that Lew was a minor when his father died; that the land was mortgaged and that the way he and Lew got it was by paying off the mortgage, getting the money at other places to redeem the land, and that is the way they got their claim to it. He claimed one half of the land and that the other half was Lew's. He told Buser at different times that they were partners; that they owned the land in common, owned it together, owned everything there together; that Jeff had said to him, "They would never have undertaken it if it had not been the old homestead; he and Lew had taken it over and were going to try to pay it out"; that, to the suggestion that it was a big undertaking, Jeff had answered: "There will be better days. This land will be worth more money"; that Jeff believed that the way he and Lew got to own the land was that the indebtedness on the land was more than it was worth, and that they took it in order to keep the old home place, and said: "Lew and I own 400 acres." He said to Johann, when they were about to buy an automobile, referring to his brother: "We have over 400 acres of land; we own it together", and Johann testified that he had heard him make a like statement to Bowman at Muscatine. The wife of Lewis Billick testified to certain conversations between T. J. Billick and other persons, in which she did not participate; that, about two years previous, in conversing with one Hise, he had said that he and Lewis owned the farm together; that after his father died, he had told Lewis if he would stay with him and help him through, he would become half-interest owner in the real estate; that Lewis had stayed by him and that they were just getting in fair shape so that they could see their way out; that the title to the land was in his name as a matter of convenience; that he said to another man that they owned the place together. This evidence is undisputed in any way; that Lewis worked on the farm continu-

ously, as did his wife, after his marriage, is fully proved. Deceased was not strong and gave more attention to the business end. The execution of 19 real estate and 30 chattel mortgages, together with the rendition of numerous judgments against him or them, bear mute testimony to the struggle of these men to acquire and retain these lands. All had been satisfied except two mortgages amounting to $12,000, executed in 1911, and some small claims filed against the estate. Besides this, they had constructed a new house, made over the barn and erected a hog house and made other improvements, in all an expense of over $3,000.

Much that witnesses testify to relates what deceased declared he proposed to do in the future. This may have been owing to the method pursued in the transaction of the business apparently necessary during the minority of Lewis A. Billick, and which was followed thereafter, possibly as a matter of habit or, as intimated in the record, for the preservation of a home to Jefferson. They may well be construed as relating to their joint ownership or his obligation to convey because of having acquired the property in pursuance of their previous partnership arrangement. Such declarations are not inconsistent, but in entire harmony, with his statements to other witnesses concerning his proposal of partnership shortly after his father's death, the acceptance of such proposition by Lewis, and how the purposes of such joint enterprise had been carried out. The manner of handling and cultivation of the land, its improvement and the fact that Lewis neither had nor claimed other recompense for his labors for nearly 26 years, strongly confirm the inference to be drawn from such declarations that a partnership had been formed and the lands acquired in its behalf, as deceased repeatedly stated. This is not a case where a partner purchased with his own funds, as in *Norton v. Brink*, 75 Neb. 566, 575 (121 Am. St. 822), but where partnership funds have been used for that purpose. See *Robinson Bank v. Miller*, (Ill.) 27 L. R. A. 449. As said in *Van Buskirk v. Van Buskirk*, 148 Ill. 9, 20:

"There is a clear distinction between proof of the declarations of the grantees to the effect that he holds the title for another, or has agreed to convey to another, and his declarations or admissions to the effect that another person's money was paid for the land. Declarations of the latter class are entitled to more weight than those of the former class."

It is not pretended that the deceased had any means out of which to purchase lands, save those derived from the mutual enterprise in which the brothers were jointly engaged; and, though considerable business sagacity was manifested in manipulating the indebtedness which apparently would not down, we are abidingly convinced that a copartnership was entered into, as alleged, shortly after the father's death; that it continued down to the death of T. J. Billick; that all the lands in controversy, except 80 acres previously acquired by him, were purchased in his name for the partnership, and whatever was paid thereon, aside from borrowed money, was out of the income from the farm. Having so found, it necessarily follows that deceased held title as trustee for himself and Lewis A. Billick. Decree should have been entered adjudging the latter the owner of one half of all the land except the S. E. ¼ N. W. ¼ and S. W. ¼ N. E. ¼ of Section 13, and awarding one fourth of said 80 acres and of one half of the remaining land each to Mrs. Lutz, James H. Billick and Lewis A. Billick and to the heirs of Freed Billick.

Probably some further order will be necessary with reference to the payment of incumbrances and claims, and the cause is remanded for the entry of a decree not inconsistent with this opinion.—*Modified* and *Remanded*.

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.