CHARITON FEED AND GRAIN, INC.,
an Iowa Corporation, Appellee,

v.

Isaac HARDER, Appellant,

Carl T. Davidson, Carl or Dorothy Davidson, Davidson's Holstein and Angus Farm, and 3–D Farms, Defendants.

No. 83–983.

Supreme Court of Iowa.

June 19, 1985.

Bert A. Bandstra, Knoxville, and Paul Doster, Pella, for appellant.

William L. Shelton, Chariton, for appellee.

REYNOLDSON, Chief Justice.

We granted further review in this appeal to determine whether trial court erred in holding a landlord under the usual stockshare lease liable to a livestock feed supplier on the theories of partnership, agency and unjust enrichment. The court of appeals split three to three, hence the trial court's decision stood affirmed by operation of law. We vacate the court of appeals disposition and reverse the district court judgment.

Most of the facts developed at trial were undisputed. Defendant Isaac Harder, employed as an engineer in a Texas aircraft factory, purchased a 308-acre Marion County farm on contract in 1974. For reasons detailed later, it was unfortunate that he executed a routine fifty-fifty crop-share lease with defendant Carl Davidson,[1] to commence March 1, 1977. It was still more unfortunate that he executed a stock-share lease with Davidson for a term commencing March 1, 1978. As it turned out, the most Harder received for a $30,000 payment to Davidson for livestock was, according to Davidson, "maybe a few sheep."

---

1. Davidson's wife and business entity also were named defendants. For simplicity, we shall refer to them as "Davidson."

There seems to be no dispute that the stock-share lease was prepared by Davidson, or by someone else at his direction. Although inartfully drawn in some respects, it appears to be the ordinary farm lease commonly employed in Iowa for situations in which the landlord and tenant share interests and expenses not only in the crops but also in the livestock. The instrument was entitled "Farm Lease," and consistently referred to the parties as "Landlord" and "Tenant." The tenant was to pay the landlord "½ of the receipts from all farm products sold." There is an itemization of the expenses to be shared, including feed. Other identified expenses were to be the separate obligations of the landlord and of the tenant. Especially relevant to the issues in this appeal are two paragraphs of the lease:

11. The Tenant shall have full management control, including but not limited to, when to sell the goods, where to sell the goods, to whom to sell the goods, what feed to buy, where to buy the feed, and how much feed to buy.

12. Tenant shall use the proper farming methods in the management of said farm.

No joint bank account was established. This left the problem of when and in what manner Harder was to pay his share of the joint expenses. Consistent with his contractual management role, Davidson bought feed from various firms. There is no evidence Harder ever exercised any control over where the feed was purchased, the amount, or the price. He did receive some of the bills and part of the time these accounts were placed in Harder's name. Sometimes Harder sent the feed expense money to Davidson, sometimes directly to the seller. Later, and long before any of the feed involved in this controversy was sold, Davidson—again exercising his contractual right to manage the operation— unilaterally started to purchase all feed in his own name and thereafter sought reimbursement from Harder for one-half. Davidson testified the parties understood that he was then going to take the responsibility for paying the feed bills.

The feed furnished by plaintiff Chariton Feed and Grain, Inc. (Chariton Feed), was fed to livestock in which Harder thought he had a one-half interest but which, in fact, Davidson brought to the farm through leases and other arrangements with third parties. On the occasions when Harder visited the farm he always was led to believe all the livestock he saw there was subject to the stock-share lease arrangement. There is no dispute that Davidson consistently lied to and misled Harder, and the stock-share lease agreement never functioned as contemplated by the written agreement. Harder lived in Texas and traveled about 750 to 800 miles to Iowa once or twice a year, when, of course, he would check on his substantial farm investment. At intervals Davidson sent him reports and accounts, usually showing expenses that exceeded the receipts. Davidson could not remember sending Harder any money.

The feed Davidson purchased from Chariton Feed was purchased in his own name during the period May 18, 1979 to June 21, 1980. The payments Davidson did make were on his personal checks, variously styled "Davidson's Holstein and Angus Farms" and "3–D Farms" (after his wife's name, Dorothy Darlene Davidson). Paul Umbenhower, manager and owner of Chariton Feed, testified Davidson led him to believe that he, Davidson, owned all the cattle on the Harder farm. The account was in Davidson's name alone. Umbenhower looked to Davidson alone for payment. There is no evidence Chariton Feed had any knowledge of an alleged interest of Harder in the livestock until all the feed had been purchased and Davidson was being pursued for payment.

In January 1981 Umbenhower placed a telephone call to Harder in Texas. The former testified at trial that, "I asked Mr. Harder if he was the one that was in partnership with Mr. Carl Davidson and he said, yes, he was." Harder denied he ever indicated to anyone he was a partner of

Davidson in the farming operation. He testified concerning this conversation:

Q. All right. Just tell us as best you recall what he said to you and what you said to him.... A. He asked me if I owned half the cattle up in Iowa and at the time I thought I did and I did say, "Yes." Then he said that Carl had been charging feed to him and he owed a bill.

Now, I don't remember whether he even told me the size and then he said that, you know, he never indicated I owed anything, didn't even ask me that. But he said he was going to take some action against Carl and I am sure I said, "Okay."

Trial court adopted Umbenhower's version of this conversation. The court further found that Harder in this telephone exchange "admitted liability for the feed purchased on account by Davidson from Chariton Feed & Grain, Inc." Even Chariton Feed does not contend there was any evidence to support the latter finding.

Both Davidson and Harder testified that in making their second agreement they intended to make a stock-share lease, not a partnership. There is a substantial question left by this record whether Davidson even intended to comply with a stock-share lease. Further evidence of Davidson's actual and fraudulent intent during his association with Harder was supplied through the testimony of John Jensen, county supervisor for the Farmers Home Administration (F.H.A.) in Marion County. Davidson sought an operating loan from F.H.A. in February 1979. He presented Jensen with a crop-share lease upon which Harder's name had been forged, and claimed to own all the livestock on the farm.

The record reflects that at least by the fall of 1980 Davidson was in deep financial trouble, and his creditors, including Chariton Feed, were closing in. He sold numerous cattle belonging to other people. Before or during January 1981, Davidson abandoned the farm and any agreement he had with Harder was terminated.

It was at this point that Harder, seeking to salvage something, authorized his brother-in-law, who lived in Knoxville, to pick up and sell some of the stock remaining on the farm. On January 19, 1981, several butcher hogs and small pigs were sold at public auction for $1768.69 in Harder's name. An attempt on January 20, 1981, to sell 50 stock cows in which Harder thought he owned an interest was aborted when a third party claimed them. By January 24, 1981, the sheriff was on the farm with F.H.A.'s Jensen, Harder and several third persons. When various owners finished claiming their livestock, thirteen dairy cows remained. These were sold and F.H.A. paid Harder one-half of the proceeds.

Trial court overruled Harder's motions for a directed verdict, for judgment notwithstanding the court's ruling, and for new trial.

The court, proceeding for the most part from the above facts, concluded a partnership existed. In reaching this determination it may not have had the benefit of several Iowa decisions because, as the trial ended, the court advised counsel that, "rather than to have you submit any briefs—and I think it is a question of law—I think I will ask the same effort that would go into preparing briefs go into preparation of proposed Findings and Conclusions." The court also found Harder liable on the basis of agency, and on the ground of "unjust enrichment or quantum meruit."

Iowa decisions have treated these livestock-share leases as *sui generis,* and generally hold they are leases and not partnerships in the absence of stipulations or evidence clearly manifesting a contrary purpose. Our view that the lease in issue is the sort of ordinary farm lease commonly seen in Iowa is supported in this record by F.H.A.'s Jensen, who testified such stock-share leases are more common in Marion County than crop-share leases. Thus we reexamine our long-standing common law with a careful concern for the impact on

the great number of Iowans who will be affected.[2]

## I. *Issue of Jurisdiction.*

Chariton Feed raises a threshold question relating to our jurisdiction for further review. We transferred the case for determination by the court of appeals under Iowa Rule of Appellate Procedure 401. As we already have noted, that court was evenly divided. Hence, the decision of the trial court stood affirmed by operation of law. Iowa Code § 602.5106 (1985).

Chariton Feed points to Iowa Code section 602.4102, which delineates the right to our further review of court of appeals decisions. Iowa Code section 602.4102(2) provides that supreme court jurisdiction over the appeal "ceases" when the case is transferred, and is not regained except upon a grant of further review under section 602.-4102(4). According to section 602.4102(4) "[a] party to an appeal *decided* by the court of appeals may, as a matter of right, file an application with the supreme court for further review." (Emphasis added.)

■ The controlling question is whether the appeal was "decided" by the court of appeals when it was affirmed by operation of law. We hold it was. The written announcement by the court of appeals that it was evenly divided and that the trial court accordingly was affirmed by operation of law was, typically, very terse. Of course the opposing legal views were not set out.

■ We think, nonetheless, for purposes of the statute restoring jurisdiction to us, the appeal was decided. The statute does not require that, in order for jurisdiction to revert to this court, the case be decided by the court of appeals on its merits, only that it be decided. We take this to mean, in context, that it be finally resolved. An affirmance by operation of law is such a final resolution.

We cannot believe that the legislature, in drafting Iowa Code section 602.4102, intended to deny a party any opportunity for further review in those rare but critical situations in which the issues may be so close that the court of appeals divides evenly. One would assume that such cases would be the most appropriate for further review. Some support for our view appears in our decision in the early case of *Zeigler v. Vance*, 3 Iowa 528, 529 (1856). We have jurisdiction for further review.

## II. *Scope of Review.*

■ The parties to this appeal do not seriously dispute that this action was at law. Thus our scope of review is for correction of errors of law. Iowa R.App.P. 4. Trial court's findings of fact have the force of a special verdict and are binding on this court if supported by substantial evidence and justified as a matter of law. *Keith v. Community School Dist. of Wilton*, 262 N.W.2d 249, 255 (Iowa 1978); Iowa R.App.P. 14(f)(1). Evidence reviewed for its substantiality is to be viewed in the light most favorable to the judgment. *Blunt, Ellis & Loewi, Inc. v. Igram*, 319 N.W.2d 189, 192 (Iowa 1982). We are not bound by trial court's determinations of law, however, nor precluded from examining whether trial court applied erroneous rules of law that materially affected its decision. *Id.; see Gere v. Council Bluffs Community School Dist.*, 334 N.W.2d 307, 309 (Iowa 1983). Stated in different terms, we have said we are not precluded from "inquiry into the question whether, conceding the truth of the facts found, a con-

---

**2.** There also may be a concern about an older landlord's social security benefits. Rentals generally are excluded from computation of net earnings from self-employment. 42 U.S.C.A. § 411(a)(1) (1983). On the other hand, net earnings from self-employment include a partner's distributive share of a partnership. 42 U.S.C.A. § 411(a). Although the issue is one of federal law, *see Kahn's Estate v. Commissioner*, 499 F.2d 1186, 1189 (2d Cir.1974), the terms "partner" and "partnership" for social security purposes have the same meaning as when used in subchapter K of chapter 1 of Title 26 of the Internal Revenue Code. 42 U.S.C.A. § 411(d) (1983) (West Supp.1985). At least one federal decision notes that the "over-all criteria of the existence of a partnership are the same under the revenue laws as under common law." *Cobb v. Commissioner*, 185 F.2d 255, 258 (6th Cir. 1950).

clusion of law drawn therefrom is correct, nor are we bound by trial court's determination of the law." *Briggs Transportation Co. v. Starr Sales Co.,* 262 N.W.2d 805, 811 (Iowa 1978).

■ Narrowing our focus to the first issue before us, what constitutes a partnership and whether a written instrument creates a partnership is a question of law for the court. *Florence v. Fox,* 193 Iowa 1174, 1178, 188 N.W. 966, 967 (1922) ("[T]he construction of the contract was a question of law for the court, and ... it was for the court to determine whether it constituted a partnership contract, and was so intended by the parties."); *Johnson Bros. v. Carter & Co.,* 120 Iowa 355, 359, 94 N.W. 850, 851 (1903); J. Crane and A. Bromberg, *Law of Partnership* § 4(b) (1968) (hereafter Crane and Bromberg); F. Mechem, *Elements of the Law of Partnership* § 35 (1899) (hereafter Mechem). If the facts are undisputed, it is for the judge to decide whether a partnership exists. Crane and Bromberg § 4(c); Mechem § 35. Thus our analysis of this question should address the following subsumed issues:

(1) Does the written agreement between Harder and Davidson establish the elements essential to the creation of a partnership? This is a question of law and trial court's determination is not binding on us.

(2) Did Harder and Davidson conduct themselves as though they considered themselves a partnership, thereby supplying the essential elements of a partnership? This is a question of fact only if there is a dispute whether certain events occurred or if different inferences may be drawn from acts the parties agree occurred. If there are disputed facts in this case, then the issue becomes whether the facts, as found by the trial court, constitute substantial evidence that the parties conducted themselves as partners.

In applying the above principles to these issues, however, due regard should be given to our historic treatment of these agricultural leases. We have held that it will not be presumed that the parties to such leases intended a partnership, in the ab-

sence of stipulations or evidence clearly manifesting such a purpose.

A leading Iowa decision is *Fox,* 193 Iowa 1174, 188 N.W. 966. There the landlord provided the cows and was to receive one-half the milk and cream. Each party was to provide hogs, "share and share alike," and share in their increase. Each party was to own one-half the grain grown on the 120 acres leased. The parties were to share expenses of threshing and board of help, and both were to be informed of and have equal rights in the sale of stock and purchases of "stuff" for the farm. The court found the parties to stand in a tenant-landlord relationship, not a partnership. The court relied heavily upon the intention of the parties as expressed in the contract. The *Fox* court provided the public policy underlying its decision:

> If a partnership existed, it might be possible for the tenant, within the scope of the partnership, to purchase property and make the owner of the land responsible therefor in an amount largely in excess of the rent, and each might be responsible for the torts of the other committed within the scope of the agency. The courts hold quite generally that there are obvious reasons for holding that farm contracts or agricultural agreements, by which the owner of land contracts with another that such land shall be occupied and cultivated by the latter, each party furnishing a certain portion of the seed, implements, *and stock,* and that the products shall be divided at the end of a given term, or sold and the proceeds divided, shall not be construed as creating a partnership between the parties. Such agreements are common in this country, and are usually informal in their character, often resting in parol. In the *absence of stipulations or evidence clearly manifesting a contrary purpose, it will not be presumed that the parties to such an agreement intended to assume the important and intricate responsibility of partners, or to incur the inconven-*

*iences and dangers frequently incident to that relation.*

*Id.* at 1178, 188 N.W. at 967–68 (emphasis added). *See Wilson v. Fleming,* 239 Iowa 718, 733, 31 N.W.2d 393, 401 (1948) (Agreement determined to be a stock-share lease, the court noting "[c]ourts are reluctant to construe an arrangement such as this between a farm owner and occupant as a partnership unless such relation is clearly shown."). *See also Federated Mut. Implement and Hardware Ins. Co. v. Eng,* 178 N.W.2d 321, 324 (Iowa 1970); *Anderson v. Walker,* 256 Iowa 1324, 1328–29, 131 N.W.2d 524, 526–27 (1964); *Johnson v. Watland,* 208 Iowa 1370, 1372, 227 N.W. 410, 411 (1929); *Randall v. Ditch,* 123 Iowa 582, 584–85, 99 N.W. 190, 191 (1904).

The only decision relating to leases from any jurisdiction found in trial court's decision is *Malvern Nat'l Bank v. Halliday,* 195 Iowa 734, 192 N.W. 843 (1923). In that case *both* the landlord and the tenant argued *in favor* of a finding of partnership. The written agreement referred frequently to "the firm." Of similar limited value here is the holding in *Miller v. Merritt,* 233 Iowa 230, 8 N.W.2d 726 (1943). The *Miller* agreement provided the business should be in the name of "Miller and Merritt Bros."; all receipts and disbursements should be made through a joint bank account in the name of Miller and Merritt; and both parties would cooperate fully in managing the "firm." The agreement contained copious references to "the firm," "partnership property" and "firm property." Quite predictably, the court found the arrangement to be a partnership, relying heavily on the intention of the parties. *Id.* at 237, 8 N.W.2d at 729.

■ Neither *Halliday* nor *Miller* modify our basic principle that a stock-share lease is not to be construed as a partnership in absence of clear evidence that the parties intended to create a partnership. It is noteworthy that in the Iowa decisions confronting the lease vis-a-vis partnership issue, this court has found the relationship between the parties to be a partnership only where the parties themselves expressly described their arrangement in those terms. The public policy articulated in *Fox,* quoted above, is supported in decisions from other jurisdictions including *Shrum v. Simpson,* 155 Ind. 160, 163, 57 N.E. 708, 709 (1900):

There are obvious reasons for holding that farm contracts or agricultural agreements, by which the owner of land contracts with another that such lands shall be occupied and cultivated by the latter, each party furnishing a certain proportion of the seed, implements, and stock, and that the products shall be divided at the end of a given term, or sold and the proceeds divided, shall not be construed as creating a partnership between the parties. . . . The parties to such agreements seldom contemplate anything more than a tenancy of the land, with provision for compensation to the landlord from the fidelity, labor, and skill of the tenant. There is no community of interest in the land, which is the principal thing in the agreement, and a division and several ownership of the crops and other products are usually provided for. While the custom of renting farm lands upon shares is general, the courts have seldom held that such agreements create partnerships between the owner of the land and the tenant.

As *Fox* and *Shrum* make clear, construing what essentially is a lease arrangement as a partnership exposes the parties to unwarranted and unexpected liability for conduct that he or she ordinarily is powerless to control or direct. The case before us is a vivid example. The $26,166.32 judgment charged against Harder could be only the beginning of successive judgments in favor of livestock owners and others Davidson defrauded, all without the knowledge of the unsuspecting Harder. Meanwhile, Davidson has insulated himself from liability by taking bankruptcy.

Against the backdrop of the above cases, we return to the two subsumed issues above identified.

III. *Partnership Issue—The Written Agreement.*

The construction of a written contract, as already noted, is a question of law for the court. *Porter v. Iowa Power and Light Co.*, 217 N.W.2d 221, 228 (Iowa 1974). In construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says. Iowa R.App.P. 14(f)(14). An examination of the contract (exhibit two) in this case discloses that on its face it is the common stock-share lease. The elements of the landlord and tenant relationship are all patently present.[3] Trial court makes no definitive finding that exhibit two, on its face, is a partnership and not a lease. Nonetheless, our review relating to this law issue requires examination of this "Farm Lease" to determine whether it exhibits the elements required to create a partnership. These are (1) an association, i.e., an intent by the parties to associate as partners; (2) a business; (3) earning of profits; and (4) co-ownership of profits, property and control. Crane and Bromberg § 4; *see* Iowa Code § 544.6(1); *accord, Skaar v. Wisconsin Dept. of Revenue*, 61 Wis.2d 93, 98–99, 211 N.W.2d 642, 645 (1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974).

A. *Intent to Associate.*

In Iowa, intention to associate is "the crucial test" of partnership. *Fox*, 193 Iowa at 1178, 188 N.W. at 967 (citing *Lutz v. Billick*, 172 Iowa 543, 546, 154 N.W. 884, 885 (1915)). Exhibit two shows no intent by the parties to associate as partners. On the contrary, it recites an express intention to create the relationship of landlord-tenant. The words "partner," "partnership," "firm," or any other term usually deemed to show such an intent to form a partnership appear nowhere in the document. On the other hand, the agreement is entitled "Farm Lease." The word "Landlord" is used sixteen times; the word "Tenant" twenty times. The parties are identified in no other way. Such language, employed by the parties in their contract, is important in discerning their intent. *See Anderson*, 256 Iowa at 1328, 131 N.W.2d at 526; *Fox*, 193 Iowa at 1178, 188 N.W. at 967.

B. *A Business.*

It is clear from exhibit two that the parties had a business purpose, as opposed to a patriotic, civic, religious, sports, or similar non-business purpose. Crane and Bromberg § 12.

C. *Earnings of Profits.*

For the purposes of this analysis, this element adds nothing other than to reinforce the "business" requirement mentioned in the last paragraph.

D. *Co-Ownership of Profits, Property and Control.*

1. *Profits.*

Exhibit two contains no provision for the sharing of profits by Harder and Davidson. In paragraph two the lease requires that "[t]he Tenant shall pay to the Landlord ½ of the *receipts* from all farm products sold" (emphasis added). Paragraph four provides for the sharing of certain expenses. Reading these two provisions together, trial court inferred an agreement to share profits. This inference was the sole basis for the court's finding that the parties had a "community of interest" in profits.

Trial court's approach, of course, does not account for the requirement in the lease that each party individually assume certain expenses, which resulted in each showing a different level of profit or loss generated out of the farm operation. For

---

**3.** *See* 1 Restatement (Second) of Property § 1.1 (Requirement of a Space Having a Fixed Location); § 1.2 (Requirement That Right to Possession be Transferred); § 1.3 (Capacity and Authority to Enter into the Landlord-Tenant Relationship); § 1.4 (Lease for a Fixed or Computable Period of Time).

example, Harder's 1979 tax return disclosed a substantial farm loss; Davidson's a profit of over $36,000.[4] Obviously, profit and loss under this agreement could not be determined until each party deducted from his share of the gross receipts the expenses for which he individually was responsible. Thus, under exhibit two, Harder and Davidson did not "share profits." *See Cedarberg v. Guernsey*, 12 S.D. 77, 80–81, 80 N.W. 159, 160 (1899).

◼ Nor does exhibit two provide for the sharing of losses. Trial court inferred this, based upon the requirement that the parties share certain of the expenses, citing as authority 68 C.J.S. *Partnership* § 29(b)(2). The Iowa rule, however, is not the general rule stated in C.J.S. Our cases are in some disarray on this point, but stated most favorably to Chariton Feed, the Iowa rule is that an agreement to share losses may be inferred only where the partnership is established by other evidence. *See Anderson*, 256 Iowa at 1329, 131 N.W.2d at 527; *Malvern Nat'l Bank*, 195 Iowa at 738, 192 N.W. at 846; *Fox*, 193 Iowa at 1180, 188 N.W. at 968.

Addressing the question of profits, trial court stated that "[i]n reaching its conclusion as to the existence of a partnership, the court notes section 544.7(4)(b) of the Code of Iowa, 1979, provides that the receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." This conclusion does not take into account Iowa Code section 544.7(3):

> The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

Further, the statute referred to by trial court actually carries its own exception that further excludes this situation:

> The receipt by a person of a share of the profits of a business is prima-facie evidence that the person is a partner in

the business, but no such inference shall be drawn if such profits were received in payment:

> b. As ... rent to a landlord.

Iowa Code § 544.7(4)(b).

2. *Property.*

◼ Exhibit two contemplated co-ownership of only part of the property used in the livestock operation, being the livestock and feeding equipment. That of course does not, of itself, establish a partnership. *See Anderson*, 256 Iowa at 1327–28, 131 N.W.2d at 526; *Fox*, 193 Iowa at 1179–80, 188 N.W. at 968; Crane and Bromberg § 12(b).

3. *Control.*

◼ Co-ownership of control, or a community of interest in the administration of the business, is a key element in determining the existence of a partnership. Crane and Bromberg § 14(d); *see Malvern Nat'l Bank*, 195 Iowa at 739, 192 N.W. at 846; *Anderson*, 256 Iowa at 1327, 131 N.W.2d at 527–28. It is at this point that the provisions of exhibit two thoroughly undermine any claim of partnership. Paragraph eleven states that "[t]he Tenant shall have full management control, including but not limited to, when to sell the goods, where to sell the goods, to whom to sell the goods, what feed to buy, where to buy the feed, and how much feed to buy." Paragraph twelve provides, "Tenant shall use the proper farming methods in the management of said farm." There can be no dispute that the "Farm Lease" placed Davidson in complete "management control" of the farm operations and excluded Harder.

◼ Although obviously inartfully drawn, we find no ambiguity in the language of this "Farm Lease." Assuming trial court found it established a partnership, we cannot agree with its conclusion of law. There remain for our review trial court's findings relating to the conduct of the parties, and its conclusion the parties created a partnership by their acts.

**4.** No partnership returns were filed.

IV. *Partnership Issue—Conduct of the Parties.*

A. *Intent to Associate.*

We have noted that in Iowa the intent of the parties to associate as partners is "the crucial test." *Fox,* 193 Iowa at 1178, 188 N.W. at 967. This is the most widely accepted test for determining whether a partnership exists. Annot., 131 A.L.R. 508, 550 (1941). *See, e.g., Gangl v. Gangl,* 281 N.W.2d 574, 580 (N.D.1979); *Heck & Paetow Claim Service, Inc. v. Heck,* 93 Wis.2d 349, 359, 286 N.W.2d 831, 836 (1980).

■ At the outset we observe that if these parties had the intent to associate as partners, it was remarkable that no indication of that intent was included in the lease the parties signed to memorialize their agreement. A partnership can be formed only upon mutual consent of the parties and a meeting of the minds; the intention of one party alone cannot create the relation. *Heck,* 93 Wis.2d at 359, 286 N.W.2d at 836. It is clear that from the outset Davidson did not even intend to comply with the lease, let alone an unexpressed partnership understanding. The fact findings trial court adopted do not take into account Davidson's intent. A conclusion that Harder intended to associate as a partner is based upon two findings. The first was the court's selection of Umbenhower's version of the telephone call to Texas, rather than Harder's. In this version the latter, following all the relevant events, allegedly responded in the affirmative when asked if he was in partnership with Davidson. The second was Harder's efforts to sell livestock from the farm after Davidson had left the farm and their relationship had terminated. Trial court concluded "such control shows Harder believed himself to be more than a one-half owner of the livestock and a mere landlord."

■ Trial court's finding that Harder responded in the affirmative to the inquiry relating to a partnership is entitled to little weight on the scale of substantial evidence. Even in written instruments, the general rule is that "laymen misuse legal terms, and the fact they call each other partners is not conclusive if the essential elements of partnership are lacking in their relationship." Crane and Bromberg § 5(a). When a party refers to himself or herself as a partner in the course of a conversation, courts are very reluctant to give the statement any weight at all. *Brotherton v. Gilchrist,* 144 Mich. 274, 277, 107 N.W. 890, 891 (1906); *Whetstone v. Purdue,* 107 Or. 86, 90–91, 213 P. 1014, 1016 (1923); *Zuback v. Bakmaz,* 346 Pa. 279, 282, 29 A.2d 473, 474 (1943); *Morris v. Resnick,* 268 Wis. 410, 417, 67 N.W.2d 848, 851 (1955).

■ Of similar inconsequential weight were Harder's desperate acts with respect to the livestock in which he thought he had an interest after Davidson departed the scene. No matter what arrangement Harder and Davidson had, the record affirmatively shows it had terminated at that point. Thus Harder's acts could neither be considered in furtherance of, nor in conformance with, a partnership association.

B. *A Business.*

There is no issue concerning this element, as it related to the acts of the parties.

C. *Earnings of Profits.*

Similarly, there is no issue relating to this element.

D. *Co-Ownership of Profits, Property and Control.*

1. *Profits.*

Trial court's decision reveals no finding that the parties, by their behavior, indicated an intention to share profits. Certainly the distinction between a contemplated sharing of gross receipts and a sharing of profits is commonly drawn and recognized as valid. Iowa Code § 544.7(3) (1979); Crane and Bromberg § 14(c); 68 C.J.S. *Partnership* § 30(b)(6).

### 2. *Property.*

Although the farm lease clearly provided for co-ownership of certain livestock and feeding equipment, Davidson's maneuvers largely avoided even this limited requirement. Trial testimony was undisputed that, as a result of Davidson's duplicity, Harder in fact never owned a one-half interest in livestock "other than a few sheep."

It is also important that the major assets utilized in this association—the real estate owned by Harder and the machinery owned by Davidson—were and remained the separate assets of the parties. *See Gangl,* 281 N.W.2d at 580–81; *Shrum v. Simpson,* 155 Ind. at 163, 57 N.E. at 709.

### 3. *Control.*

The main battleground at trial was the attempt to show that Harder, despite the lease provisions, exercised the requisite control of the business. Typically, testimony on this topic "concerns who gave instructions, hired and fired employees, had the say on how money was spent, or made important business decisions. If one participated to a significant degree in these functions, he had sufficient control. If he did not, the normal result is no partnership." Crane and Bromberg § 14(d). The search for objective evidence of joint control of the business usually focuses on acts such as holding licenses, assuming a firm name, keeping books that show a capital account for each party, or filing federal partnership tax returns. *Id.* at § 14(a). None of these indicia, of course, were present here. Significantly, Kevin Sharp, the farmhand who helped Davidson, testified that he was Davidson's employee and had never met Harder.

Trial court relied on the following findings in concluding Harder had the requisite control of the operations: feed accounts during an early period were put in Harder's name, thus enabling him to close the accounts had he become dissatisfied with the amount of feed or its cost; the parties corresponded or talked by telephone about once a month; Harder periodically visited the farm; Davidson furnished Harder a monthly accounting; and Harder sold hogs in his own name following Davidson's departure.

We already have discussed the feed account evidence. Had there been a joint bank account—one of the indicia of a partnership—other arrangements for Harder to pay the very substantial amounts Davidson was incurring in feeding other persons' livestock would have been unnecessary. As it happened, these bills, for a time, and some of Harder's bills for his separate expenses for building repair and improvement over a longer period of time, were sent directly to him. There was no modification of Davidson's right under the lease, to have sole control of "what feed to buy, where to buy the feed, and how much feed to buy," and there was undisputed evidence he consistently exercised that right. There is an inference Davidson thought Harder might be able to track his activities, thus causing Davidson to unilaterally terminate this procedure. Subsequently, Davidson purported to deduct Harder's share of the feed against milk and livestock sales, which Davidson of course received and controlled.

Regarding the telephone calls between Davidson and Harder, there again was no evidence Harder exercised or sought to exercise any control over the farming operations. When asked what was discussed during the telephone visits, Davidson testified:

A. Sometimes he just wanted to know how things was at the farm weatherwise, crop-wise; a lot of times my wife's health.

Q. Did he ever ask you anything about the livestock operation? A. Sometimes he might ask me how they was doing when I had some ready to go.

Harder's testimony was this:

Q. And did you ever talk to him about it on the telephone like how do things look out on the farm or whatever? A. In maybe general appearance. You know, like I would ask Carl the same thing, like how do things look.

Harder obviously had a considerable stake in the Iowa farm and its improvements, in addition to the $30,000 he spent for the illusory livestock. It is understandable that he was interested in the progress of his investment, but there is nothing in the above evidence from which it could be concluded he was exercising any control. This is also the rational explanation for the one-or-twice-per-year visits Harder made to Iowa, where he also had relatives.

We already have discussed Harder's conduct with respect to the livestock after the lease terminated. There remains the "monthly" accounting that Davidson erratically sent Harder. Such accountings are not unusual in share lease arrangements, and do not signal an attempt to control the operation. *See Anderson,* 256 Iowa at 1326, 131 N.W.2d at 526; *Johnson & Co. v. Marsh,* 111 Vt. 266, 15 A.2d 577 (1940). Milk proceeds were received every month. Obviously the parties concluded Harder would receive his rent monthly, in the form of receipts, less joint expenses. That this apparently generated no money to Harder is not controlling on the issue under consideration. Harder was obligated to itemize and show his share of receipts and expenses on his income tax return, and required the information supplied by the "accounting." Again, there is no indication in the record Harder exercised control upon the basis of the information thus furnished.

None of this evidence, taken together, supplied substantial evidence for the court's conclusions that Harder exercised control of the farm operation or that the conduct of the parties disclosed their intent to associate as partners.

Finally, Chariton Feed concedes the weakness of its contentions when it states in its brief:

The trial court undertook to decide the issue of the existence of a partnership, as to the Plaintiff [Chariton Feed] and Defendant [Harder], and did not purport to find whether the Defendant and

Davidson were partners as to each other, since that issue was not before the trial court.

Iowa Code section 544.7(1), however, expressly provides:

Except as provided by section 544.16, persons who are not partners as to each other are not partners as to third persons.

Iowa Code section 544.16, referred to in the statute just quoted, concerns the situation in which a person is made liable by estoppel. That statute, of course, has no application here because Chariton Feed concedes it did not even know of the stock-share lease, let alone an alleged partnership, when it extended credit to Davidson for feed.

In summary, we hold trial court erred in concluding, if in fact it did, the written agreement between Harder and Davidson created a partnership. Similarly, we hold trial court's conclusion that Harder's conduct[5] otherwise furnished the requisite proof of the existence of a partnership was not supported by substantial evidence. We thus turn to consider whether the law of agency will support the judgment against Harder.

### V. *Agency Issue.*

A minor portion of trial court's ruling is devoted to its "alternative" conclusion that Harder was liable to Chariton Feed under the law of agency.

The burden of proving an agency is upon the party asserting its existence. *Ioerger v. Schumacher,* 203 N.W.2d 572, 575 (Iowa 1973); *Martin v. Jaekel,* 188 N.W.2d 331, 333 (Iowa 1971). Although whether an agency exists ordinarily is a fact question, there must be substantial evidence on the question to generate a jury question; a scintilla is not enough. *Martin,* 188 N.W.2d at 333.

" 'An agency results from the manifestation of consent by one person, the principal,

---

5. Reference to any conduct of Davidson that would establish the existence of a partnership is conspicuously absent from the court's decision

and from Chariton Feed's brief. Clearly, he was operating solely in his own behalf and had no intention to associate as a partner.

that another, the agent, shall act on the former's behalf *and subject to his control,* and consent by the other so to act.' " *Ioerger,* 203 N.W.2d at 575–76 (emphasis added) (quoting *Pay-N-Taket, Inc. v. Crooks,* 259 Iowa 719, 724, 145 N.W.2d 621, 624 (1966)); *Martin,* 188 N.W.2d at 333; *Vischering v. Kading,* 368 N.W.2d 702, 710–11 (Iowa 1985); Restatement (Second) of Agency § 1 (1958).

█ Much of our rationale in the prior divisions relating to control applies here. Clearly the farm lease before us cannot be utilized as a source of agency. Paragraphs eleven and twelve, quoted above, vest full management control in Davidson. The parties plainly intended for Davidson to conduct the farm operation independently of any control by Harder. This reading of the lease is consonant with the fact that Harder was living and working some 800 miles from the farm.

█ It is true that the stock-share lease contemplated purchases of feed by Davidson, and placed him in complete control of that, along with all other operations on the farm. The lease requirement that Harder pay one-half of the feed expense, however, is not sufficient basis for a supplier's cause of action against Harder. The authorities hold that such an agreement is personal to the landlord and tenant and cannot be held to give supplier a cause of action against the landlord. *Johnson v. Francis,* 179 Neb. 342, 344, 138 N.W.2d 27, 29 (1965) ("The agreement of a landlord contained in a written lease to pay one-half of the purchase price of the fertilizer gives a third party no cause of action against the landlord for half of the fertilizer sold to a tenant."); *Schultz v. Williams,* 207 Wis. 122, 126, 240 N.W. 844, 846 (1932) ("A farm tenant may not thus bind his landlord, even though the landlord has agreed to furnish one-half of the feed and seed, in the absence of an original agreement between the landlord and a third party, or of facts giving rise to an estoppel.").

Nor is there substantial evidence relating to the conduct of the parties at the relevant times to generate a fact question on agen-cy. The record discloses Davidson consistently exercised what was solely his contractual right to have "full management control" in "what feed to buy, where to buy the feed, and how much feed to buy." There is no evidence Harder ever sought to control Davidson's activities in this regard. Although early in the lease term Davidson bought some of the feed in Harder's name, Davidson unilaterally terminated the practice long before buying any feed from Chariton Feed, and testified without contradiction that he intended from that time on to be solely responsible for the feed bills.

It also is clear that Davidson was not acting on behalf of Harder in purchasing the feed, as required by the above definition of agency. The evidence was overwhelming that he was acting solely in his own interests and against the interests of Harder.

█ We hold Harder was not liable on the basis of agency for the feed Davidson purchased from Chariton Feed.

VI. *Quantum Meruit Issue.*

█ Trial court also found Harder liable to Chariton Feed on the ground of unjust enrichment or quantum meruit, relying on section 40 of the Restatement of Restitution:

A person who has rendered *services* to another or *services* which have inured to the benefit of another or who has affixed chattels to the land or chattels of another is entitled to restitution therefor if the services were rendered or the chattels were affixed:

(c) in the mistaken belief, of which the other knew or had reason to know, that the *services* would inure to the benefit of the one giving them or of a third person or that the other promised to pay for them.

(Emphasis added.)

In the circumstances of this case, the above section is inapplicable. It is couched in terms of services, not goods sold and delivered. Second, Restatement of Restitu-

tion, section 40 comment d makes clear that section 40 was designed to provide for restitution by one who accepts services from another with knowledge that the other is under a mistaken belief that the recipient, or a third party, has promised compensation.

"Where he knows that the other is under a mistake as to the terms of payment, his conduct in permitting the continuance of the services subjects him to liability for their value." *Id.* This rule assumes that the recipient enjoys greater knowledge of the circumstances under which the service is rendered than does the provider of the service. The facts of the instant appeal do not conform to that model. Harder knew no more of Davidson's precarious finances than did Chariton Feed. Similarly, Chariton Feed made no mistake as to the party with whom it dealt. Davidson ordered the grain, accepted delivery and promised to pay. Chariton Feed did not mistakenly deliver the goods to Harder, who, knowing of Chariton Feed's error, accepted them in bad faith.

It is also clear that Harder did not benefit from the grain in a way that would distinguish his position from that of any landlord who has stock-share leased a farm to a financially strapped tenant. The trial court found Harder benefitted from the feed because he received credit for a portion of the milk and calf crop. These receipts were, however, rent to Harder, not payments to him as an owner of the enterprise. Any landlord benefits by continued receipt of rent from a tenant whose creditors do not press their claims. Moreover, the feed was consumed by livestock in which Harder had no interest. The conclusion that Harder was unjustly enriched in any way through his lease with Davidson must be viewed by the former with more than a little irony.

Finally, Chariton Feed is confronted by the principle that the remedy of unjust enrichment or quantum meruit is based upon the concept of implied contract, and that in this jurisdiction the law will not imply a contract where there is an express

contract. *Vischering v. Kading,* 368 N.W.2d 702, 712 (Iowa 1985); *Guldberg v. Greenfield,* 259 Iowa 873, 878, 146 N.W.2d 298, 301 (1966). An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter. *Vischering,* 368 N.W.2d at 712; *Maasdam v. Estate of Maasdam,* 237 Iowa 877, 887, 24 N.W.2d 316, 321 (1946). Here the record is uncontroverted that Chariton Feed had an express contract with Davidson for the price of the feed. Therefore no claim based on implied contract will lie.

We hold trial court erred in holding Harder liable on Chariton Feed's account on the basis of quantum meruit or unjust enrichment.

We vacate the court of appeals disposition, reverse the district court judgment and remand for judgment for defendant Harder.

DECISION OF COURT OF APPEALS VACATED AND JUDGMENT OF DISTRICT COURT REVERSED.

All Justices concur except HARRIS, McGIVERIN, CARTER, and WOLLE, JJ., who dissent.

HARRIS, Justice (dissenting).

After an exhaustive discussion of defendant Davidson's version of the facts and after reciting legal principles with which, in general, I agree, the majority reaches a conclusion at variance with that of the trial court. For at least three reasons I disagree with the majority's analysis.

The majority grants the appellant what amounts to a de novo review in this law action. The review should be on error and, no matter what our own findings might have been, we should affirm the trial court's conclusion if it was supported by substantial evidence. Iowa R.App.P. 14(f)(1).

Second, the majority has not reviewed the plaintiff's evidence in an effort to determine whether it supported the trier of fact's conclusion. Rather, it has scoured

the record to search for that evidence which would support a contrary conclusion. Under the proper scope of review: "findings of fact by trial courts are ... given a *liberal construction favorable to the judgment."* *Bahnsen v. Rabe,* 276 N.W.2d 413, 414 (Iowa 1979) (emphasis added).

If the majority has concluded as a matter of law that a partnership did not exist it was inappropriate to do so on this record. Only if the facts are undisputed may the judge decide whether a partnership exists; otherwise it is a question of fact. *See* Crane and Bromberg § 4(c); Mitchem § 35 (cited by majority). Here the facts are in dispute.

No one claims the written lease here amounted to articles of partnership. The instrument would be an issue if the dispute were between the parties to it. But even an express disclaimer of partnership does not bar third persons from seeking to show that one existed. This has been the rule in Iowa since *Devin v. Harris,* 3 G. Greene, 186, 187 (1851). Where there is a written agreement its wording is not conclusive as to the existence of a partnership. The traditional tests for the existence of a partnership apply to farm leases when the claim is made that a landlord and tenant were in partnership. *Anderson v. Walker,* 256 Iowa 1324, 1328–29, 131 N.W.2d 524, 526–27 (1964). Those characteristics were explained in *Malvern National Bank v. Halliday,* 195 Iowa 734, 739, 192 N.W. 843, 846 (1923) as follows:

> The salient features of an ordinary partnership are (1) a community of interest in profits and losses (2) a community of interest in the capital employed and (3) a community of power in administration.... The relation is predicated on mutual consent and is evidenced by the terms of the contract, the conduct of the parties, and the circumstances surrounding the transaction.

This was the test employed by the trial court in determining that a partnership existed here.

Although it was not argued by the parties the majority seems to suggest that a finding of partnership here might impact adversely on social security benefits for some elderly Iowans. I have reservations about whether a serious threat would be posed by such a precedent. It is outside the scope of this suit to argue whether more Iowans have been or would be damaged than benefited by claims that stock share lease arrangements were de facto partnerships.

Taking, as we should, only the evidence which supports the trial court's determination, a question was made out for the finder of facts. There was important evidence that Davidson admitted he was in partnership with Harder. Although Davidson contradicted this testimony, the trial court was entitled to believe it.

Two characteristics are usually absent in crop share leases and their absences are said to be the missing ingredients for what would otherwise be a partnership. 21 Am. Jur.2d *Crops* § 40 (1981) (farm share leases lack mutual principals and joint accounts). Here, however, there was significant evidence tending to prove these two partnership characteristics. Davidson was authorized to deal with suppliers on behalf not only of himself but also Harder. It is also clear that, in later stages of the operation, it was agreed that Davidson was to pay suppliers directly from one fund he controlled.

The evidence of the existence of a partnership was certainly not overwhelming but a proper question was presented. We should affirm.

McGIVERIN, CARTER and WOLLE, JJ., join this dissent.