Clarence HAGGARD, Plaintiff and
Appellant,

v.

Paul ROTZIEN, Defendant and Respondent.

Civ. No. 8813.

Supreme Court of North Dakota.

July 31, 1972.

Vogel, Bair & Brown, Mandan, for plaintiff and appellant.

Thompson, Lundberg & Nodland, Bismarck, for defendant and respondent.

PAULSON, Judge.

Clarence Haggard brought this action in the District Court of Burleigh County, North Dakota, to obtain an accounting and a declaration of rights relative to an alleged partnership between the defendant, Paul Rotzien, and himself. The district court dismissed Haggard's complaint and awarded judgment on Rotzien's counterclaim, which is not before this court on appeal. Haggard has demanded a trial de novo in this appeal and since the notice of appeal was served and filed prior to July 1, 1971, the effective date of the repeal of our trial de novo statute, this appeal will be tried de novo. Automobile Club Insurance Company v. Hoffert, 195 N.W.2d 542 (N.D.1972).

Clarence Haggard is a real estate broker and rancher who owns and lives on an 840-acre ranch located west of Hazelton near the Missouri River. He is 64 years of age and was employed by three livestock auction markets in the State, acting as a radio broadcaster and advertiser for them. He has known the defendant, Paul Rotzien, who is a cattle buyer, for many years and

the two parties have had various business dealings together during those years. On one occasion Mr. Rotzien bought cattle and pastured them on the Haggard ranch; Rotzien supplied the money and Haggard supplied the land, and the profits were split 50–50. On another occasion Haggard was aware of some cattle which were for sale and he advised Rotzien that the cattle were available for purchase. The two men, based on their combined expertise, examined the cattle and made an offer to their owner, from whom Rotzien purchased the cattle. Shortly thereafter these cattle were resold at a profit and Haggard received a $1-per-head commission from Rotzien. In another business venture, Haggard and Rotzien and a third party, a man from Dickinson, bought cattle and silage together and fed the cattle for resale. None of these dealings are particularly relevant to the case at bar except that they show the method of doing business between the parties to this action. The arrangements made between Haggard and Rotzien were very informal and were not formalized in writing and Rotzien provided the financing.

The action at bar arose from a transaction which was formulated early in 1967 when Haggard, as was his custom, was attending the weekly sale at one of the Bismarck livestock markets. There he met Harris Crimmins of Wing, a long-time acquaintance. Mr. Crimmins was the guardian of the estate of Mrs. Julia Crimmins, his mother, who owned a 515-acre ranch located about two miles from Haggard's ranch. During the course of their conversation, Haggard inquired whether Crimmins had sold his mother's ranch yet and in response Crimmins said "No. Let me sell it to you". An agreement was not reached at that time, but a few days later Haggard called Crimmins and asked Crimmins to meet him in Sterling. At this meeting Haggard was able to persuade Crimmins to reduce the asking price for the Crimmins property from $20,000 to $18,500. The two men then traveled to Bismarck, on or about February 2, 1967, to see Mr. Robert Lundberg, attorney for the Crimmins

Guardianship. The record reveals that on February 2, 1967, Haggard signed a bid on the Crimmins property for $18,500. Thereafter Haggard had the REA power switched from Crimmins' name to his own, closed the gates on the Crimmins place, made application to have the Crimmins land included in his ASC contract, and checked the fences and the wells on the property.

The record shows that Haggard did not obtain the money for the $5,550 down payment on the Crimmins property from Mrs. Lars Kleppe as he had originally intended. Haggard then talked to Rotzien about the money and took Rotzien to see Mr. Lundberg at his office in Bismarck. On February 10, 1967, Rotzien issued a check for $3,000 payable to the Crimmins Guardianship. On February 15, 1967, Rotzien submitted a written bid for $18,500 on the Crimmins property. On February 17, 1967, a report of the sale of the Crimmins property to Rotzien was presented and filed with the Burleigh County Court; and the report of sale names Rotzien as the purchaser of the property. On February 28, 1967, Rotzien executed a promissory note and mortgage payable to the Crimmins Guardianship for the balance of the purchase price. On March 10, 1967, Rotzien issued an additional check for $2,550 to the guardianship to complete the balance of the down payment on the Crimmins property. Since such time Rotzien has paid the taxes on the property and made all of the payments on the promissory note; Haggard has made no payments whatsoever.

In April and May of 1967 the fences were repaired and the wells put in operating condition on the former Crimmins property. All but the electrical work was performed by Haggard. Rotzien paid all of the expenses incurred except that Haggard supplied an electric motor from his ranch for one of the wells.

In May of 1967 Rotzien purchased 69 head of cattle and put them on the former Crimmins property. Haggard checked on the cattle and was generally responsible for their care, with Rotzien paying for all

of the expenses involved. In October of 1967 Rotzien sold 66 head of the cattle and received full payment for them. The remaining 3 head of cattle, which were later located in a neighbor's pasture, were sold by Rotzien in December of 1967. The sale price of the 66 head was $10,838.84; Rotzien estimated that the 3 remaining head would bring $320 when sold and he added the $320 figure to $10,838.84, which resulted in an aggregate sale price of $11,158.84 for the 69 head of cattle. Rotzien made a charge of $690 as the cost of pasture rent (69 head times $10) and a charge of $320 for interest on the purchase price of the cattle. These two·charges, plus the initial purchase price and trucking costs, brought the total cost of the cattle operation to $10,-258.72. This left a profit of $900.12. The 66 head of cattle were sold on October 18, 1967, and a check dated October 20, 1967, was personally delivered by Rotzien to Haggard in the amount of $450.06, one-half of the profit. On the same date Rotzien paid Mrs. Haggard $78.50 as reimbursement for the REA bills paid by her for the electricity used on the former Crimmins property. In December of 1967 when the remaining 3 head of cattle were sold, Haggard was paid an additional $70 to compensate for the erroneous estimate as to their selling price which Rotzien had computed when he sold the 66 head. There is no evidence as to the manner by which Rotzien determined that the profits were to be shared 50–50; and there is no evidence that Haggard questioned the amounts he was paid or that he refused to accept the checks.

Haggard contends that after he failed to obtain the down payment from Mrs. Lars Kleppe, he contacted Rotzien and the two of them agreed to purchase the Crimmins property as partners. He contends that he could have obtained the money from Mrs. Kleppe if it had been absolutely necessary, and Mrs. Kleppe's testimony supported this contention. Parts of Haggard's testimony were corroborated by his wife. Rotzien, on the other hand, contends that he was to purchase the Crimmins property for himself. There was evidence of a statement by Haggard that he would re-sell the former Crimmins property in a few years after the development of the Oahe Reservoir and the construction of a paved road on the property would enhance its value.

A review of the testimony of Mr. Crimmins and Mr. Lundberg reveals that they did not hear any conversations with reference to a partnership between Rotzien and Haggard.

■■ The question to be determined on this appeal is whether there is an existing partnership between Haggard and Rotzien. The district court found that they were not partners, and this finding will be accorded appreciable weight by this court. Automobile Club Insurance Company v. Hoffert, 195 N.W.2d 542 (N.D.1972), and cases cited therein. Section 45–05–06(4) of the North Dakota Century Code provides that receipt of a share of the profits is prima facie evidence of a partnership. This inference, however, is not conclusive. See cases annotated at 6 ULA (Master Edit. 1969), Uniform Partnership Act § 7, note 47.

Section 45–05–05(1), N.D.C.C., defines a partnership as:

"1. A partnership is an association of two or more persons to carry on as co-owners a business for profit."

■ After reviewing the testimony in this case, we find that there is no evidence to show that Haggard and Rotzien became co-owners either of the real property or of the cattle. All of the money expended was furnished by Rotzien; all of the transactions were carried out in Rotzien's name; and there is no evidence that Haggard had any decision-making power as to the manner in which the venture was operated. Haggard did not maintain any records of the operation, he did not know how many cattle were pastured on the former Crimmins property, and he erred in stating that the land purchase payments were to extend over ten years, instead of five. Rotzien,

however, had complete records and knowledge of the venture. The acceptance by Haggard of the checks for one-half of the profits from the cattle operation is inconsistent with a finding of the existence of a partnership because he testified that the profits from the cattle were to be used to pay for the land. Even if Haggard's testimony is given full credence as to the intentions of the parties when Rotzien made the down payment on the Crimmins property, there still would not be a partnership. We find, after reviewing the evidence, that the two men have never operated as partners. There has been no offer by Haggard to share in making the Crimmins land payments, there has been no tender back of the checks for the profits on the cattle operation, there is no partnership property, and Haggard has never shared in making the decisions of the venture. The law requires more than a loose working arrangement before a partnership is established. In 59 Am.Jur.2d, Partnership § 39, at page 960, it is stated:

"The elements generally considered critical to the existence of a partnership . . . are an intention to be partners, co-ownership of, and a community of interest in, the business of the partnership, and the sharing of profits and, generally, losses."

We believe that, in view of the above statement, where Haggard did not have an agreement as to sharing profits or making payments, this court cannot create a partnership on the basis of the record in this case.

We conclude in light of the record that Haggard and Rotzien are not partners and that Haggard has failed to sustain his burden that a partnership existed. 59 Am.Jur. 2d, Partnership § 80, p. 993.

The judgment is affirmed.

STRUTZ, C. J., ERIKSTAD and TEIGEN, JJ., and NORBERT J. MUGGLI, District Judge, concur.

KNUDSON, J., deeming himself disqualified did not participate; NORBERT J. MUGGLI, Judge of the Sixth Judicial District, sitting in his stead.