Anton GANGL, Plaintiff and Appellant,

v.

John GANGL, Margaret Gangl, Robert Gangl, Alice Gangl, and Gangl Farms, a partnership, Defendants and Appellees.

Civ. No. 9605.

Supreme Court of North Dakota.

July 11, 1979.

Rehearing Denied Aug. 2, 1979.

Kelsch, Kelsch & Tudor, Mandan, for plaintiff and appellant; argued by William C. Kelsch, Mandan.

Lester J. Schirado, Mandan, for defendants and appellees John Gangl and Margaret Gangl.

Bair, Brown & Kautzmann, Mandan, for defendants and appellees Robert Gangl and Alice Gangl; argued by Malcolm H. Brown, Mandan.

SAND, Justice.

A common family farming effort which began in the early part of this century was ended by the parties to this action following a dispute in 1976. This action was initiated by Anton Gangl when the parties failed to reach an agreement on a division of the real and personal property used in the farming operation. Anton asserted the parties' working arrangement was a partnership and thus the assets of the arrangement should be divided accordingly. The district court determined that Anton failed to establish the existence of a partnership and consequently was not entitled to a division of the property in the manner he requested. A judgment was entered accordingly, from which Anton appealed. We affirm.

After the death of their father in 1928, the Gangl family continued operation of their approximately 570-acre family farm with the oldest son, John, eventually assuming management. At that time the Gangl family consisted of the surviving spouse, Juliana, two daughters, Julia and Mary, and five sons, John, Joseph, Andrew, Anton and Henry. In 1942 John directed the filing of a federal partnership income tax return showing as "partners" Juliana and all of her children except Julia. Subsequent re-

turns indicated Andrew withdrew from the arrangement in 1945, Mary in 1948, Joe in 1957, and Juliana upon her death in 1960. These returns also indicate John's only son, Robert, was brought into the arrangement in 1960. Thus from 1960 to 1976 the returns included as "partners" John, Anton, Henry, and Robert.

Until 1976 John continued to direct the filing of federal and state partnership tax returns showing an equal division of profits and losses among the partners. Most of these returns, however, contained the written notation, "working agreement," which John contended was an indication the parties did not establish a partnership relationship. It is undisputed the parties at no time entered into a formal written or verbal agreement creating a partnership or other business arrangement.

From 1942 through 1976, John made the major decisions concerning the operation of the farm. Proceeds from all the wheat raised on the farm, as well as ASCS payments, mineral lease payments, and crop insurance proceeds, were placed in John's personal checking account. From this same account John paid all farm operating expenses, made land and machinery payments, paid the rent on leased lands, and paid all real estate taxes. In addition, he paid the personal income taxes of each of the participants.

During the latter years of the farming arrangement, each of the remaining four participants owned their own beef cows. These cattle were raised together, the calves sold collectively, and the proceeds placed in John's personal account. John would then divide the proceeds based upon an average price per calf times the number of calves sold by each individual. Testimony indicated that although John allowed Anton, Henry, and Robert to own approximately 30 cows, he himself owned between 60 to 80 cows, stating he needed the additional income to meet expenses.

Individual participants of the farming arrangement raised their own dairy cattle, hogs, and poultry. Income from these endeavors was collected and retained by the individual participants.

Real property in issue in this case was acquired at various times during the course of the arrangement and put in various participant's names. In the interest of simplicity, we will refer to numerical titles when discussing various tracts of land acquired by the parties. The tracts, and the record title owners are:

| | | RECORD OWNER | | |
| TRACT | ACREAGE | John & Margaret | Robert & Alice | Anton |
| --- | --- | --- | --- | --- |
| I | 571.29 | 285.65 | | 285.65 |
| II | 148.09 | 74.05 | | 74.05 |
| III | 591.21 | 295.60 | | 295.60 |
| IV | 330.30 | | 330.30 | |
| V | 320.00 | 213.40 | 106.60 | |
| VI | 240.71 | | 240.71 | |
| VII | 160.00 | 160.00 | | |
| TOTAL | 2,361.6 | 1,028.7 | 677.61 | 655.3 |

In addition to the above property, Henry has over 700 acres of land in his name, most of which was acquired at least in part with funds from John's checking account. Anton chose not to include Henry as a participant in this action and has not sought an interest in the land held in Henry's name.

Except for tract I, which Juliana gave to Anton and John in 1948, all of the above tracts were purchased primarily with funds from John's personal checking account. John transacted all borrowing arrangements in later years and the proceeds from loans were deposited in his personal account. These loans were later retired with funds from John's account. Also, in the 1950's, the Gangls sold one-half of the oil and gas interests in all their lands. Al-

though the checks from the sale were made out in the names of the record title owners, they were endorsed over to John and deposited in his personal checking account.

In maintaining his checking account, John did not distinguish between his personal income and expenditures and those of the joint farming arrangement. Consequently, although loans were repaid from John's account and most of the land was purchased with funds therefrom, there were no records indicating if the funds were John's personal funds or those derived from the common farming effort. Anton testified that on occasions when he requested to examine the records of the farming operation John either refused to supply him with records or supplied him with unintelligible records. Anton stated he was told if he did not like the way things were being managed he could withdraw from the arrangement.

Robert and John testified that when Robert was brought into the arrangement John promised him equal status with the other participants and that he would eventually receive some land if he continued with the arrangement. Even though it is not clear if Anton and Henry were aware of this promise, they did not object to Robert's participation and the eventual transfer of lands made to him, although the transfers were initially made without their knowledge.

In 1941, John arranged a contract for the purchase of tract III which was placed in Anton's name. In 1948, Juliana Gangl gave John and Anton one-half interest in the home place (tract I). John testified his mother gave the one-half interest to Anton at John's request so if anything happened to John, Anton would be able to take care of his mother and sisters. John also stated a few years later he wanted the one-half interest turned over to him and Anton refused. John then presented Anton with the alternative of transferring either one-half of tract III, or one-half of tract I to John, or else John would have his mother change the deed to tract I and give it all to him. Anton subsequently delivered a deed for a one-half interest in tract III to John. An-

ton, on the other hand, testified he delivered the deed of one-half interest in tract III just before he got married to provide John a means of caring for his mother in case something happened to Anton. The deed was placed in the family safe and was never recorded until 1977 after this dispute arose.

In this action Anton sought to set aside the 1950 deed conveying the one-half interest in tract III to John and also sought a one-third partnership share of tracts IV, V, and VI. The district court denied both claims and Anton challenged both denials on appeal.

Anton also sought a division of certain personal property used in the farming effort. According to Anton, after the dispute in 1976 the parties met to attempt a division of the major items of machinery. A list of this machinery was prepared and the four participants took turns choosing from the list. A list of the machinery Anton was to receive was prepared and signed by Anton, John, Henry, and Robert. The district court concluded this division was an accord and satisfaction of Anton's interest in all the personal property acquired by the common farming effort. Anton contended this division was only as to those major machinery items contained on the list and that he has an interest in any remaining personal property acquired with funds from the joint farming effort.

The heart of this action concerns the status of land now held in the names of John, Anton, and Robert and the respective interests of each of the three men in that property. It appears the participants in the joint farming effort shared the labor of that endeavor and hoped to share in any profits therefrom. Although no one testified to an exact agreement of how much each participant would receive for his efforts, all stated they participated under the expectation of receiving some land for participation.

Anton contended, in effect, that because the parties could not reach an agreement as to their respective interests in the property, their arrangement should be considered a

partnership and the property derived from that arrangement divided accordingly. Section 45–05–05 of the North Dakota Century Code defines a partnership as "an association of two or more persons to carry on as coowners a business for profit."

 The existence of a partnership is not governed by one conclusive criterion but by the facts and circumstances of each case. Certain elements or tests, however, are suggested within the statutory definition and are considered important, and even critical, to the existence of a partnership. These elements are: an association, or an intention to be partners; co-ownership of, and a community of interest in, the business of the partnership; and the profit motive. *Haggard v. Rotzien*, 200 N.W.2d 112, 115 (N.D.1972). See, Crane and Bromberg, Law Partnership, § 4 (1968).

 Under § 45–05–06(4), NDCC, the receipt by a person of a share of the profits (with recognized exceptions) of a business is prima facie, but not conclusive, evidence that he is a partner in the business. *Haggard v. Rotzien, supra,* at 114. Although the presumption does not conclusively establish the existence of a partnership, profit-sharing is an essential element and a primary attribute of partnership. 1 Rowley, R., Rowley on Partnerships, § 7.6(B) (2d ed. 1960). It is not necessary that partners share profits equally as they may agree on any proportion or formula. Crane and Bromberg, *supra* at § 14(b).

The income from the joint farming effort in this case was derived primarily from the sale of cattle and the sale of wheat. This income was either used to pay expenses, purchase machinery and land, or else distributed to the participants.

Basically, income used to pay expenses is not considered profit but is subtracted from total income to derive the amount of profit. In the present case, the parties agreed John received all proceeds from the sale of wheat. There also was no dispute that John owned more cattle than the other participants and thus retained more proceeds from the sale of calves. This unequal sharing of income would initially indicate a nonsharing of profits, however, testimony disclosed that funds from the sale of wheat were used, or were supposed to be used, for the payment of expenses or for the purchase of land and machinery. In addition, testimony indicated John needed the additional cattle proceeds to meet expenses. That the wheat proceeds and added cattle proceeds were retained by John for the payment of expenses does not necessarily mean profits were not shared among the participants. Rather, where those funds were used to pay expenses and the remaining funds were either distributed or used for the common business effort, the opposite is shown. Those remaining funds in this case were represented by the cattle proceeds, and the land and machinery purchased with joint farming proceeds.

The cattle proceeds were divided on the basis of the number of cattle owned and raised by each participant. Although John was allowed to own substantially more cattle, if the proceeds from the additional cattle were used to meet expenses, all the participants received relatively the same amount of cattle proceeds that represented income minus expenses, or profit. Even if the additional cattle were not used to meet expenses, there is no requirement that all forms of profit of a partnership be divided equally if the partners agree otherwise, which the participants apparently did in this case.

Other forms of profit in this case were represented by land and machinery purchased with proceeds from wheat sales. Although John stated he used personal funds to purchase some of this land and machinery, there is no dispute the payments on such property were made from John's account which also contained proceeds from the sale of wheat and other incomes such as ASCS payments and proceeds from the sale of mineral rights. Testimony disclosed that all the participants were recognized as having an ownership interest in the land and the machinery. That representations of profit in the form of land and machinery were shared by the parties is further demonstrated by the fact that each participant

was to receive some land for his efforts and that land was actually placed in each participant's name; and in addition the parties divided the machinery upon dissolution of the arrangement.

The above analysis demonstrates the parties shared the profits derived from their joint farming effort. Although the sharing of profits is a primary facie indication of a partnership it does not conclusively establish the same. If other elements of a partnership are absent, the existence of a partnership is rebutted.

▆▆▆ An element of our statutory definition of partnership is association. The term connotes not only a group of two or more persons but also voluntariness. Consequently, the existence of the element focuses on the intent of the participants to be a part of a relationship which includes the other essential elements of partnership (profits, co-ownership, etc.). Such intent need not necessarily be vocalized either in writing or orally, if it can be derived from the actions of the parties. The participants must intend to be part of an association that includes *all* the essential elements of a partnership for that association to be a partnership. That the parties considered themselves partners is persuasive, however, not necessarily conclusive evidence of intent as one or more of the essential elements of a partnership may be lacking from the arrangement which they consider a partnership.

▆▆▆ Although it appears the parties to this case commonly referred to themselves as partners, John preferred to call it a "working agreement." We conclude, however, that the description the parties gave their arrangement is not determinative of this case especially where the record indicates the parties did not intend to be part of a relationship which included the other essential elements of a partnership.

▆▆▆ The second element of a partnership is the co-ownership of, and a community of interest in, the business of the partnership. This element of co-ownership includes not only the power of control, but also the sharing of profits and generally losses. We have already considered profit sharing because of the traditional importance which is placed on that factor. Profit sharing does not, however, necessarily indicate a community of interest as employees, for instance, may have a common interest measured by profits. Consequently, we turn to examine the other factors of co-ownership.

▆▆▆ Control is an indispensable component of co-ownership which, when combined with profit sharing, strongly suggests the existence of a partnership. In the words of the draftsmen of the Uniform Partnership Act which was adopted by this State in Chapter 45–05, N.D.C.C.:

> "To state that partners are co-owners of a business is to state that they each have the power of ultimate control." Official Comment to § 6, Uniform Partnership Act.

An important qualification to the control test is, however, that a person may be a partner even though he has entrusted control of the business exclusively to his associates. The question then becomes whether or not the participant had the *right* to exercise control in the management of the business.

In this case the record supported a finding by the trial court that John made all or virtually all of the decisions concerning management of the joint farming effort. Anton failed to demonstrate he or the other participants possessed the power to make even day-to-day management decisions. More fatal, however, was his failure to demonstrate a right either in himself or combined with the other participants, to exercise control over the management of the farming arrangement. To the contrary, the record as it exists indicates such right of control rested exclusively in John.

Neither is co-ownership demonstrated by the participants' ownership interests in the major assets of the partnership. The only major asset in which the partners recognized a mutual ownership interest was the machinery. The cattle were individually owned, and the land as it was purchased

was placed in the name of one or two participants—never in the names of all the participants or the name of a partnership entity.

A question also exists in this case as to whether or not losses were shared. While the partnership tax returns that were filed show the participants as sharing equally in profits and losses, the record does not bear this out. John testified that in some years when a loss was sustained he contributed his personal funds to make up that loss. It is undisputed that none of the other participants contributed their personal funds for purposes of loss sharing. In addition, the parties testified the cattle proceeds were divided on the basis of the number of live offspring from an individual participant's cows. Thus, if a calf died, which could be considered a loss of sorts, that loss was not shared equally by the participants but borne by the party owning the adult animal. We conclude Anton has not shown a sharing of losses among the participants.

The remaining element of a partnership is the profit motive. Here there is no issue that the farming business was operated for a profit.

In summary, the record discloses that the business was operated to make a profit with a sharing of those profits. It also discloses mutual ownership of some personal property, but most of the association's assets were individually owned. The record does not, however, show a sharing of losses. More importantly, it does not demonstrate the individual participants had a right of control or intended to have a right of control over the management of the business. The arrangement can more readily be characterized as, or likened to, John assuming and acting as a surrogate father with tacit consent of the others than it can be a partnership.

■ The evidence in this case shows an arrangement whereby the participants agreed to work together under the direction and control of John. In return, each participant would receive a share of the profits, primarily in the form of land, cattle proceeds in proportion to the number of cattle

owned by the individual, and an interest in any machinery purchased. If the parties' actual arrangement was other than this, it is not demonstrated by the record. This court cannot create a partnership on the basis of the record presented in this case. "The law requires more than a loose working arrangement before a partnership is established." *Haggard v. Rotzien, supra* at 115. We conclude, as did the trial court, that Anton has failed to show the existence of a partnership in this case.

Anton argued the land purchased with funds from the joint farming effort should be divided as partnership property. As authority, Anton cites us to a rule set forth at 60 Am.Jur.2d *Partnership* § 94:

"It has frequently been stated that the facts that the property was bought with partnership money and that it is used in the partnership business are sufficient to impress upon the property the character of partnership real estate, although the legal title may be in the names of the individual partners."

Anton's argument assumes the existence of a partnership which we have specifically found not to exist. Absent the existence of a partnership, the participants' agreement must be considered a contractual arrangement. On the record we must thus try to determine the terms of that contractual arrangement and if they were complied with.

■ The parties appear to have agreed to join in the farming arrangement in return for which they would receive cattle proceeds, a share of the machinery, and "some" land. No one, however, testified as to the exact amount of land each participant was to receive, or even that they were to necessarily receive equal shares. If anything, the record discloses the parties were to receive only the land that John decided to give them in the exercise of his control of the arrangement. Had Anton sought an equitable division of property before a court at the time the land was being divided, he may have been in a stronger position. Where, however, he and the other partici-

pants explicitly and impliedly acquiesced in transfers made by John at the time they were made, we can only conclude the divisions were acceptable to the parties at that time and thus within the parties' implied agreement. We cannot now set aside such transfers based upon speculation as to what one or more participants may have intended when they entered the farming arrangement. The participants' ratification of subsequent actions is stronger evidence of the terms of the contract than our speculation as to the parties' original intent.

We are aware of Anton's argument that he did not object to other transfers of land, because he believed he was the sole owner of tract III. He stated he reached this belief on the basis of a statement made by John that the 1950 deed transferring a one-half interest in tract III had been destroyed. We might be more receptive to this argument if it had been established as a fact that John had told Anton the deed had been destroyed. That evidence was, however, controverted by John's testimony that he did not tell Anton the deed had been destroyed, but rather that he had destroyed a power of attorney given him by Anton. The determination of what was said in this conversation was a finding of fact which we will not set aside unless clearly erroneous. *Slope County, Board of County Commissioners v. Consolidation Coal Co.*, 277 N.W.2d 124 (N.D.1979). The trial court found the evidence failed to establish by a preponderance that there was a conversation wherein John said he destroyed the 1950 deed. Anton has not demonstrated to us on appeal that the trial court's finding was clearly erroneous.

As a third issue, Anton argued the 1950 deed from Anton to John of a one-half interest in tract III should be set aside on grounds of ineffective delivery. Anton contended the delivery of the deed to John was conditional. The 1950 deed was given to John and placed in the family safe to which Anton did not have access. The trial court, relying on our opinion in *Gajewski v. Bratcher*, 221 N.W.2d 614 (N.D.1974), ruled inadmissible parol evidence that delivery of the deed was conditional. In *Gajewski* we determined parol evidence was inadmissible to vary the terms of a quitclaim deed which was freely and voluntarily delivered without fraud or mistake. Because Anton has failed to prove fraud at the time of the execution, or involuntariness of delivery, we agree with the trial court as to the applicability of *Gajewski*. We also find applicable § 47–09–07, NDCC, which states:

"A grant cannot be delivered to the grantee conditionally. Delivery to him or to his agent as such is necessarily absolute and the instrument takes effect thereupon, discharged of any condition on which the delivery was made."

*Adams v. Little Missouri Minerals Association*, 143 N.W.2d 659, 673 (N.D.1966).

The trial court also rejected evidence of a discussion between John and Anton in the Fall of 1976 when the parties were dividing the assets of the farming arrangement, wherein John offered certain lands to Anton. Anton stated this evidence was offered to show the farmland was commonly owned and that John never considered the status of record title ownership as material. The trial court ruled the evidence inadmissible as an offer to compromise under Rule 408 of the North Dakota Rules of Evidence. Anton argued the discussion took place prior to the existence of a dispute and thus Rule 408 is not applicable.

When the alleged offer was made a difference in interests and view existed between the parties as to make evidence of the offer subject to Rule 408, NDREv. See McCormick on Evidence, 2nd Ed. § 274. Although the action had not been initiated when the offer was made, Rule 408 does not require the filing of suit to show the existence of a dispute.

If a partnership had been found to exist in this case, Anton's argument may have carried merit in determining if the land constituted divided or undivided profits of the partnership. Here, however, no partnership has been shown. The evidence in question was offered to show ownership in variance with record title ownership.

Under the facts of this case we will not allow title ownership to be varied by oral evidence of an offer to compromise.

Anton also asserted he was entitled to additional personal property not divided by the parties in 1976. The trial court concluded the 1976 division constituted an accord and satisfaction of Anton's interest in the personal property. The determination of the intention of the parties in making a division of personal property, and thus that such division was an accord and satisfaction was a finding of fact. *Slope County, Board of County Commissioners v. Consolidation Coal Co., supra.* We conclude the trial court's finding of fact was not clearly erroneous and thus will not be set aside.

In summary, Anton has failed to prove the existence of a partnership as to bring into operation the provisions of Chapter 45–05, NDCC, to divide the assets of the arrangement. He also failed to show as the basis for setting aside earlier land transfers and a division of personal property, that the trial court's findings of fact were clearly erroneous.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.