#31120-a-SPM
**2026 S.D. 31**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

RICHARD D. SLEEP and KAREN E.
SLEEP, husband and wife; JEFFREY E.
SLEEP and JODI K. SLEEP, husband and
wife; MATTHEW R. SLEEP; MELISSA A.
DEAN; SLEEP RANCHES, LLC, a South
Dakota Limited Liability Company; SLEEP
LAND AND LIVESTOCK COMPANY, LLC,
a South Dakota Limited Liability Company;
IRONCREEK LAKE CAMPGROUND & STORE,
LLC, a South Dakota Limited Liability
Company; and IRON CREEK, LLC, a
South Dakota Limited Liability Company,          Plaintiffs and Appellees,

    v.

GLORIA SLEEP STEELE, a/k/a
GLORIA G. STEELE, and STEELE
REAL ESTATE, LLC, a South Dakota
Limited Liability Company,          Defendants and Appellants.

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

THE HONORABLE MICHELLE K. COMER
Judge

CONSIDERED ON BRIEFS
MARCH 17, 2026
OPINION FILED **05/20/26**

JEFFREY G. HURD
EMILY M. SMORAGIEWICZ of
Bangs, McCullen, Butler, Foye
    & Simmons, L.L.P.
Rapid City, South Dakota

KENNETH E. BARKER
Belle Fourche, South Dakota

Attorneys for defendants and appellants.

Attorney for plaintiffs and appellees.

#31120

MYREN, Justice

[¶1.] Richard Sleep and Gloria Steele inherited a ranch and a campground from their father. Throughout the years, Richard has operated the ranch and campground and delivered Gloria an annual check based on her ownership interest. In 2018, Richard filed this action, seeking a partition of the properties and a declaration that he and Gloria had not formed a general partnership. Gloria resisted Richard's claims, arguing that she and Richard created a partnership. The circuit court determined the parties did not create a partnership. The circuit court also determined that the parties had reached an enforceable agreement for the sale of Gloria's interest in a cattle herd to Richard. Gloria appeals. We affirm.

**Factual and Procedural Background**

[¶2.] Eugene and Ruth Sleep owned land and raised cattle in Lawrence County (Sleep Ranch). They also owned a campground near Spearfish (Iron Creek Lake) (Sleep Ranch and Iron Creek Lake are collectively referred to as "Estate Property"). Eugene and Ruth had two children, Richard Sleep and Gloria Steele.

[¶3.] While growing up, Richard helped Eugene with the ranching operation. Gloria participated less in the ranching activities but helped Ruth around the home and in the operation at Iron Creek Lake. In the early 1960s, Richard left Sleep Ranch to attend college. After returning to Sleep Ranch, Richard was paid as an employee, received a W-2, and was given a small herd of cattle as a wedding gift. Eugene operated both Sleep Ranch and Iron Creek Lake as a single business.

[¶4.] Eugene died intestate in 1967. Under the intestacy laws at that time, Ruth, Richard, and Gloria each received a one-third interest in Eugene's estate, which consisted of real estate, cattle, and ranching equipment. Following Eugene's death, Richard assumed responsibility for operating Sleep Ranch. Ruth oversaw the bookkeeping and continued to pay Richard as an employee.

[¶5.] In the summer of 1968, the first camping season following Eugene's death, Gloria and Ruth managed Iron Creek Lake. From 1969 to 1975, Gloria and her husband, Bob Steele, managed Iron Creek Lake. Gloria and her husband received and retained all the profit from Iron Creek Lake over those six years. During this time, Gloria did not receive any share of the profit from the cattle operation. In 1975, Gloria and Bob decided to step away from managing Iron Creek Lake, and Richard and his wife, Karen, agreed to assume that task. They have exercised sole control over Iron Creek Lake since then.

[¶6.] Also in 1975, Richard bought Ruth's interest in Eugene's estate. The contract between Ruth and Richard clarified that it did not create a partnership between them and that it did not disturb Gloria's one-third interest in Eugene's estate. Gloria was not a party to this contract and was unaware of it until after it was executed. The day after Richard purchased Ruth's interest in Eugene's estate, Richard's attorney drafted a proposed lease, addressing Gloria's one-third interest in the Estate Property. Richard testified that he presented the lease to Gloria and told her he did not intend to be partners. Gloria testified that she did not recall having any discussion with Richard about a proposed lease and never signed one.

[¶7.]  After purchasing Ruth's one-third interest, Richard began managing the books and accounts of Sleep Ranch and Iron Creek Lake. He testified that he consulted an accountant regarding the handling of tax matters for the operations, and the accountant recommended that Richard file a Form 1065 partnership tax return. Richard has filed a partnership tax return each year. Richard testified that he believed tenants in common must file partnership tax returns. He also testified that his main concern regarding tax matters was that the Internal Revenue Service accepted the forms he submitted.

[¶8.]  Richard and Karen created a checking account for Sleep Ranch. Only Richard and Karen have access to this account. From 1975 to 2004, Richard distributed one-third of the proceeds from the Estate Property to Gloria, with checks drawn on the Sleep Ranch checking account. Each year, Richard provided Gloria with a Schedule K-1 form documenting her distribution.[1] Richard testified that the amount that Gloria received each year included "deductions for typical carrying costs of land, such as weed control, taxes and insurance," but that "Gloria never paid any bills, purchased equipment, materials, or supplies." Richard also testified that when Sleep Ranch operated at a loss, operational reserves covered the losses, and he did not personally cover them or ask Gloria to do so.

[¶9.]  Since Eugene's death, Richard has exercised sole control over the Sleep Ranch operation, and since 1975, over the Iron Creek Lake operation. Gloria

---

1. A Schedule K-1 form is the Internal Revenue Service Form for reporting a "Partner's Share of Income, Deductions, Credits, etc." https://www.irs.gov/pub/irs-pdf/f1065sk1.pdf.

has not participated in the day-to-day management of these operations, though she has suggested ways Richard could improve profitability.

[¶10.] In the late 1990s, Richard and Gloria began discussions with an attorney about organizing the Estate Property into a business or businesses. In a letter to Richard and Gloria, the attorney explained the purpose of creating the business entities as "providing a mechanism to manage family assets under one umbrella organization." As a result of these discussions, the parties' attorney formed several business entities. The parties did not file operating agreements for these entities, did not transfer property into them, and held no meetings to manage these businesses. The business entities were eventually canceled or administratively dissolved when no annual reports were filed with the Secretary of State.

[¶11.] In the early 2000s, Richard and Gloria began discussing the possibility of Richard acquiring Gloria's interest in the Estate Property. In 2003, they discussed the sale of Gloria's interest in the cattle herd (80 head) to Richard for $60,000. Believing that an agreement had been reached, Richard delivered a $60,000 check to Gloria in December 2003 for "80 mixed age cows." However, Gloria did not cash the check. In December 2004, Richard sent Gloria an additional $6,032.47 check for "3 bulls & profit on calves." Gloria did not cash this check either and explained, "I have not sold my cattle to you and your checks in the amounts of $60,000 and $6,032.47 have not been cashed." In May 2004, Gloria wrote a letter to Richard, which read, in part: "I'm returning your check until we have an opportunity to complete the tax file information and have a purchase

agreement drawn for the cattle." Later, in a 2008 letter, Gloria explained, "The sale of the cattle, separate from the rest of the ranch, Iron Creek Lake operation and other estate properties had never been discussed and we have not discussed the cattle, except in regard to tax implications[.]"

[¶12.] In 2004, Richard converted his payments to Gloria from payments based on her interest in the herd to "rent" payments based on her one-third interest in the real property. To calculate that rental value, Richard testified that he assessed comparable rental rates that he had paid other landowners as well as prevailing agricultural lease rates in neighboring counties. He did not consult with Gloria about the appropriate rental amount for her interest in the real property.

[¶13.] Richard testified that around 2004, Gloria began to refer to Richard as her "partner" and suggested that their relationship was a "partnership." In several letters to Richard, Gloria referred to herself as his partner and described the trust she had placed in him as the manager of the operations at Sleep Ranch and Iron Creek Lake. However, in other correspondence, in which Gloria proposed a partition of the estate property, Gloria described her intentions: "Specifically, I am not interested in being part of a business entity with you or your family such as an LLC or partnership. I have made known to you my interest in retaining all of Beaver Creek and retaining half or more of the value of Iron Creek Lake as a way of partitioning the value of my 1/3 interest." Later, in 2010, Gloria proposed leasing her interest in the estate property. The proposed lease agreement read, "**No partnership intended.** It is particularly understood and agreed that this lease

shall not be deemed to be or intended to give rise to a partnership relation." (Emphasis in original).

[¶14.] Throughout the late 2000s and 2010s, Richard and Gloria were unable to reach an agreement on dividing the Estate Property. In 2018, Richard filed this lawsuit requesting partition of the Estate Property and a circuit court declaration that he and Gloria had not formed a partnership. In her counterclaim, Gloria requested the circuit court to declare they were partners and that "Sleep Ranch Partnership did not sell its cattle operation to Richard." After exchanging initial pleadings, the parties agreed to bifurcate the partnership and partition issues.

[¶15.] A court trial on the partnership issue was held before the circuit court in December 2020. Both Richard and Gloria testified. They each described their understanding of the Sleep family history, how the family had acquired the properties, how Sleep Ranch and Iron Creek Lake had operated over time, and their relationship to one another.

[¶16.] Following the trial, the parties submitted post-trial briefing and proposed findings of fact and conclusions of law. The circuit court found the parties did not have the intent to associate for the purpose of carrying on a business jointly. It ultimately determined that "Gloria has failed to meet her burden of proving by a preponderance of the evidence that she and Richard formed a partnership under South Dakota law." "Instead, [the circuit court] concludes Sleeps have established as a matter of fact and law, no partnership between Richard Sleep and Gloria Steele was ever formed." The circuit court also concluded that "Gloria sold her interests in the Estate livestock and thereafter, received 'rent' payments." It explained that

"Richard's acceptance of Gloria's offer is established in his delivery of the check for the agreed-upon amount" and that "[a]fter the fact, Gloria disavowed that she had agreed to the sale of the cattle."

[¶17.] The circuit court subsequently conducted a second trial to resolve the partition dispute and then issued a "Final Judgment (Trials I and II)" that resolved all claims. Gloria then appealed, claiming the circuit court made clearly erroneous factual findings, that it erred when it concluded that the parties had not formed a partnership, and that it clearly erred when it found that Gloria agreed to sell her interest in the cattle herd.

## Decision

### 1. Whether the circuit court erred in concluding that Richard and Gloria had not formed a partnership.

[¶18.] The parties disagree about the applicable standard of review. Citing this Court's decision in *McGregor v. Crumley*, 2009 S.D. 95, ¶ 20, 775 N.W.2d 91, 97, which explained "[t]he existence of a partnership is an issue of fact," Richard suggests the clear error standard is the applicable standard of review. Conversely, Gloria suggests that whether a partnership is formed is a mixed question of law and fact. She asserted that "[i]n this case, almost all the facts are undisputed." She asserts "[t]he question is whether those facts establish the existence of a partnership," and is a question of law reviewed de novo.

[¶19.] In describing the mixed question standard, this Court has explained, "[w]hen deciding cases involving a mixed question of law and fact, the proper standard of review is dependent upon the nature of the inquiry." *In re Est. of Simon*, 2024 S.D. 47, ¶ 17, 11 N.W.3d 36, 40. "If application of the rule of law to the

facts requires an inquiry that is 'essentially factual'— one that is founded 'on the application of the fact-finding tribunal's experience with the mainsprings of human conduct'—the concerns of judicial administration will favor the [trial] court, and the [trial] court's determination should be classified as one of fact reviewable under the clearly erroneous standard." *Id.* (alterations in original) (quoting *Stockwell v. Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d 52, 59). "If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo." *Id.* (quoting *Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d at 59).

[¶20.]     We review the circuit court's factual findings for clear error. Whether a partnership was or was not formed under SDCL 48-7A-202 "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles[.]" *See In re Est. of Simon*, 2024 S.D. 47, ¶ 17, 11 N.W.3d at 40 (quoting *Stockwell*, 2010 S.D. 79, ¶ 16, 790 N.W.2d at 59). Accordingly, we will review the circuit court's conclusion that a partnership was or was not formed as a question of law, subject to the de novo standard.

[¶21.]     Under SDCL 48-7A-202(a), a partnership is formed by "the association of two or more persons [who] carry on as co-owners a business for profit . . ., whether or not the persons intend to form a partnership."[2]

---

2.     The facts relating to this appeal date back to the late 1960s. Both parties relied on the Uniform Partnership Act (UPA) in their appellate briefing.

(continued . . .)

In determining whether a partnership is formed, the following rules apply:

(1) Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property.

(2) The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.

(3) A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment:

(i) Of a debt by installments or otherwise;

(ii) For services as an independent contractor or of wages or other compensation to an employee;

(iii) Of rent;

(iv) Of an annuity or other retirement or health benefit to a beneficiary, representative, or designee of a deceased or retired partner;

(v) Of interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds, or increase in value derived from the collateral; or

(vi) For the sale of the goodwill of a business or other property by installments or otherwise.

SDCL 48-7A-202(c).

[¶22.]        This Court has also explained that "there is no arbitrary test for determining the existence of a partnership." *McGregor*, 2009 S.D. 95, ¶ 20, 775 N.W.2d at 97–98 (quoting *Ins. Agents, Inc. v. Zimmerman*, 381 N.W.2d 218, 220 (S.D. 1986)). "[E]ach case must be governed by its own peculiar facts[.]" *Id.* ¶ 20, 775 N.W.2d at 98 (citation omitted). Still, various principles may guide the circuit court's assessment of whether a partnership exists.

---

(. . . continued)

Neither party contends that partnership law in place before the adoption of the UPA controls this case.

[¶23.] For instance, while the parties' subjective intent to form a partnership is not dispositive, they must nonetheless intend to associate to carry on a business for profit jointly. *See* SDCL 48-7A-202(a) (declaring that "the *association* of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership" (emphasis added)). In *Ziegler v. Dahl*, 691 N.W.2d 271, 276 (N.D. 2005), the North Dakota Supreme Court explained that the phrase "whether or not the persons intend to form a partnership" was not meant to "change the elements of partnership formation."[3] Instead, "[t]he purpose of the phrase was to clarify that a partnership could be created regardless of the parties' subjective intent, making it possible for individuals to inadvertently create a partnership despite their expressed subjective intent *not* to do so." *Id.* at 276 (emphasis added); *see also Uniform Partnership Act* § 202, cmt. 1 (1997). The *Ziegler* court observed that intent to form a partnership is "[o]ne of the most important tests of whether a partnership exists[,]" 691 N.W.2d at 275, but also noted that "this element focuses 'on the intent of the participants to be part of a relationship which includes the other essential elements of [a] partnership,'" *id.* at 276 (alteration in original) (citation omitted). A writing or oral communication may

---

3. Under SDCL 48-7A-1201, the UPA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of [SDCL chapter 48-7A] among the states enacting it." Although this Court has an obligation to independently interpret South Dakota's version of the UPA, decisions from other jurisdictions that have also adopted the UPA can prove helpful to that task. Much of this Court's case law regarding the formation of general partnerships predates the adoption of the UPA. Other jurisdictions have more developed bodies of post-UPA case law.

evidence such intent, or it may be "derived from the actions of the parties." *Id.* (citation omitted).

[¶24.]        Similarly, the parties' joint ability to manage and control the business may indicate a partnership relationship. *See In re KeyTronics*, 744 N.W.2d 425, 441 (Neb. 2008) (describing "control sharing" as "objective indicia" of the existence of a partnership); *Gangl v. Gangl*, 281 N.W.2d 574, 580 (N.D. 1979) ("Control is an indispensable component of co-ownership which, when combined with profit sharing, strongly suggests the existence of a partnership."). Proof of direct day-to-day involvement is unnecessary, but "[e]vidence that one party has sole control and management of the business supports a finding that a partnership does not exist." 68 C.J.S. *Partnership* § 72 (April 2026 Update); *Ziemann v. Grosz*, 10 N.W.3d 801, 810–11 (N.D. 2024) ("A partner does not have to actually exercise control 'but only needs to have the right to exercise control in the management of the business.'" (citation omitted)). Ability to control or manage the business separates partnerships from "passive co-ownership of property[.]" *Uniform Partnership Act* § 202, cmt. (1997). Thus, it follows that "[j]oint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property." SDCL 48-7A-202(c)(1).

[¶25.]        Profit sharing and capital contributions are also appropriate considerations in assessing whether a partnership exists. *McGregor*, 2009 S.D. 95, ¶ 20, 775 N.W.2d at 98 (The existence of a partnership "may also be supported by evidence that the [partners] shared profits from the business." (citation omitted)).

However, "[t]he sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived." SDCL 48-7A-202(c)(2). At the same time, the right to share in a partnership's profits also entails a responsibility to share in its losses.

[¶26.] Much of Gloria's appellate briefing is devoted to assessing the circuit court's finding that the parties lacked the intent to form a partnership. The question of intent is a question of fact, reviewed for clear error. *See In re Est. of Simon*, 2024 S.D. 47, ¶ 18, 11 N.W.3d at 41 ("Treating issue of intent as factual matters for the trier of fact is commonplace." (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982))); *see also Ziemann*, 10 N.W.3d at 810 (assessing whether the parties had the requisite intent to form a partnership as a question of fact, applying the clearly erroneous standard).

[¶27.] On appeal, Gloria highlights the evidence she believes demonstrates that they had the necessary intent and that the circuit court's factual finding to the contrary was clearly erroneous. Specifically, she notes that Richard filed partnership tax returns for decades, that they attempted to form other business entities together, and that they occasionally referred to each other as partners. Gloria advanced each of these arguments before the circuit court. Conversely, Richard presented evidence that described a different understanding of the same evidence. He also presented evidence showing that he had exercised complete control over the operation of the Estate Property and had merely shared gross returns in proportion to Gloria's ownership interest.

[¶28.]     The circuit court carefully considered each of Gloria's arguments and all the evidence associated with them.  It entered 47 specific factual findings related to the considerations previously identified when assessing the existence of a partnership.  Each of these findings is supported by evidence in the record and is not clearly erroneous.  Based on these specific findings regarding the appropriate considerations, the circuit court ultimately found that the parties did not intend to associate as co-owners in a business for profit.

[¶29.]     When assessing the circuit court's factual findings for clear error, this Court reviews the evidence in the record in its entirety and in the context in which it was presented to the circuit court.  Gloria's arguments turn on her own perception of how the evidence in the record could have been weighed.  However, Richard's arguments reveal that the same evidence could be viewed differently and be afforded different weight than Gloria suggests.  The circuit court's factual findings are not clearly erroneous, and based on these findings, the circuit court did not err when it concluded that no partnership existed between these parties.

> ### *2.     Whether the circuit court erred when it concluded Richard and Gloria created an enforceable contract for the sale of 80 head of cattle.*

[¶30.]     "The existence of a contract is a question of law." *Nelson v. Est. of Campbell*, 2023 S.D. 14, ¶ 28, 987 N.W.2d 675, 685 (quoting *Harvey v. Reg'l Health Network, Inc.*, 2018 S.D. 3, ¶ 55, 906 N.W.2d 382, 398).  This Court reviews questions of law de novo.  *See Alexander v. Est. of Hobart*, 2025 S.D. 39, ¶ 16, 24 N.W.3d 758, 764.

[¶31.]  Gloria argues that she did not consent to the sale of her interest in the cattle herd. She contends that she and Richard were negotiating a global agreement, and that Richard mistakenly believed she had agreed to sell her interest in the herd. In her view, there was no mutual assent to support an agreement.[4]

[¶32.]  "To form a contract, there must be a meeting of the minds or mutual assent on all essential terms." *Suvada v. Muller*, 2022 S.D. 75, ¶ 28, 983 N.W.2d 548, 558 (quoting *Jacobson v. Gulbransen*, 2001 S.D. 33, ¶ 22, 623 N.W.2d 84, 90). "Consent of the parties to the contract must be free, mutual and communicated by each to the other." *Paweltzki v. Paweltzki*, 2021 S.D. 52, ¶ 29, 964 N.W.2d 756, 765 (quoting SDCL 53-3-1). "Consent is not mutual unless the parties all agree upon the same thing in the same sense." *Paweltzki*, 2021 S.D. 52, ¶ 29, 964 N.W.2d at 765 (citation omitted); *see also* SDCL 53-3-3. "[W]hen in dispute, '[w]hether the parties had a meeting of the minds is a question of fact' for the circuit court to determine[.]" *Paweltzki*, 2021 S.D. 52, ¶ 30, 964 N.W.2d at 765 (second alteration in original) (citation omitted).

[¶33.]  The circuit court's factual findings regarding the parties' agreement for Richard to buy Gloria's interest in the cattle herd are less detailed than its findings

4.  The circuit court found that Gloria consented to sell 80 head of cattle, representing her interest in the herd. Some courts have held that contracts for the sale of cattle are contracts for the sale of goods, implicating Article 2 of the Uniform Commercial Code (UCC). *See Albrecht v. Fettig*, 932 N.W.2d 331, 338 (Neb. 2019) ("This matter involves a sale of cattle, which are movable at the time of identification in the parties' purchase agreement. Thus, the U.C.C. governs this matter."). The parties have not addressed whether the UCC was applicable in this case. Given the nature of Gloria's claim, it is unnecessary to decide whether the UCC applied or to perform a technical UCC analysis because mutual assent principles apply to all contracts.

related to the partnership issue. Despite their imprecision, it is evident that the circuit court found that Gloria had agreed to sell her share of the cattle to Richard for $60,000, only to try to back out of the deal. The circuit court was presented with evidence that the parties began negotiating a sale of Gloria's interest in the Estate Property in 2003. Richard emphasized that after the parties began negotiating, they reached an agreement regarding the cattle and that he had delivered a check to Gloria for her interest in the herd. Gloria acknowledged that they had discussed the sale of her share of the cattle on the terms identified by Richard. Still, she asserted that it was only part of an incomplete negotiation over the distribution of the entire estate. Gloria asserted that no part of the negotiation was final until there was an agreement on the entire Estate Property. To support her position, Gloria introduced letters she wrote to Richard following the delivery of his check. The circuit court was required to weigh the conflicting testimony and evidence, and it clearly rejected Gloria's version of the events. Consequently, the circuit court's finding that the parties agreed to the terms of a contract for the sale of Gloria's interest in the cattle is not clearly erroneous. Based on its factual findings, the circuit court did not err in concluding that the parties formed an enforceable contract for the sale of the cattle.

[¶34.] We affirm.

[¶35.] JENSEN, Chief Justice, and GUSINSKY, Justice, concur.

[¶36.] SALTER and DEVANEY, Justices, concur in part and dissent in part.

DEVANEY, Justice (concurring in part and dissenting in part).

[¶37.] I agree with the majority opinion's determination that the circuit court did not err when concluding that a partnership did not exist. However, I respectfully disagree with the majority opinion's resolution of the second issue presented in this appeal. In my view, the circuit court clearly erred in finding that Richard and Gloria had reached an agreement for the sale of Gloria's interest in the livestock.

[¶38.] On this issue, the circuit court found that, "In 2003, Richard and Gloria negotiated the sale of Gloria's interest in her 80 head of cows" and that "Richard's acceptance of Gloria's offer is established in his delivery of the check for the agreed-upon amount." Notably absent, however, is a finding that Gloria made such an offer. More importantly, there was no testimony or evidence from either Gloria or Richard that would support such a finding. Gloria provided the full context of what led to Richard giving her a check for the cattle when testifying at trial. She also provided significant documentary evidence corroborating her version of the events, none of which was included in the circuit court's findings.

[¶39.] Gloria explained that in the late '90s she and Richard started to discuss ways to divide their interests in the Estate Property and determine the value of its various components. At that time, they determined that the market value of 80 head of cattle was $60,000. Years later, in 2003, Gloria and Richard had discussions with her accountant regarding tax implications associated with the sale of land or cattle and Gloria's concerns about the absence of documentation to support Richard's accounting of her 1/3 ownership share in the K1 Partnership tax

returns. According to Gloria, she never expressed, during these discussions, that she was willing to sell her share of the cattle separate from the rest of the Estate Property.

[¶40.] Gloria testified that she was surprised when Richard gave her a $60,000 check for the cattle at a meeting in December 2003 during which they were discussing a potential settlement relating to other parts of the estate. During her testimony, Gloria referred to a letter, admitted as an exhibit, that she had written to Richard in 2008 detailing their interactions over the years with respect to their attempts to settle their interests in the estate. In the letter, she explained that she initially kept the check because she thought they were getting close to reaching an agreement with respect to the rest of the estate. Gloria testified that she gave Richard a proposed agreement, in January 2004, relating to the division of the rest of the property. She stated that there were several other pieces that they were considering, including a "1031 exchange,"[5] and they had also been discussing how the rest of the cattle were accounted for.

[¶41.] Gloria explained that after further discussions, Richard rejected her proposal. She then sent him a letter on May 10, 2004, stating that she was returning the $60,000 check "until we have an opportunity to complete the tax file information and have a purchase agreement drawn for the cattle." The circuit court entered a finding stating that, in this letter, Gloria "admitted an agreement was reached but that it merely needed to be endorsed in writing." This characterization

---

5. A "1031 exchange" is "a like-kind property exchange" that allows one "to receive tax deferred benefits under 26 U.S.C. § 1031." *Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 2014 S.D. 56, ¶ 1, 852 N.W.2d 413, 415.

is clearly erroneous, particularly when considering the testimony from both Gloria and Richard and the related documentation admitted as evidence that explains the events leading up to and following this letter.

[¶42.] At trial, Richard provided testimony that was consistent with Gloria's. He testified that he and Gloria had agreed on the $60,000 price, but he never clearly expressed that they agreed to anything else with respect to the cattle. Richard's counsel asked him if Gloria ever said, "I will take $60,000 for my 80 head of cows." He responded, "No, she didn't say that. I just paid her that much there." When pressed on what made him believe they had an agreement, he kept referring to their agreement *as to the price*. His counsel then asked him, "Did she say 'I agree that that's the price I will accept' or words to that effect?" Richard responded, "Well, she agreed on the price of $60,000, and that. Yes, she agreed to that and nothing further." When asked what he meant by "nothing further", he stated, "Well, I didn't – well, the last part you said there, I'm not sure that was included in the agreement."

[¶43.] On cross-examination, Richard provided further testimony that was consistent with Gloria's account:

> Counsel: You and Gloria were talking about buying out her interest in the ranch, true?
>
> Richard: That's right.
>
> Counsel: You were talking about buying the land, the cattle, and the equipment; true?
>
> Richard: We were, yeah. That would be right.
>
> Counsel: Okay. Did she ever once say to you she was willing to sell her cattle without selling everything else?

Richard:    She agreed on the price and that was – that was the only part we talked about.

. . .

Counsel:    Did she ever say, though, "I'm willing to sell you my cattle, sell out of the ranching business, and simply own real estate and equipment"? Did she ever agree to that?

Richard:    Not in those particular words that you said.

Counsel:    What particular words would she have said that with?

Richard:    Well, she agreed on that part there, and we were talking about everything at the time. When we agreed on something, why, that was it.

Counsel:    Well, but she never agreed to sell one piece just by itself, did she?

Richard:    Well, I don't know that she had the terminology there, but I had anticipated that she agreed to sell her cattle and that we agreed on the price, and that. If it wasn't to be sold then, why, we'd have waited until later because the price changes every week.

. . .

Counsel:    It is true Gloria never once agreed to sell her cattle separate and apart from the land and the equipment; true?

Richard:    I guess separate and apart from land and equipment was never in there.

Counsel:    And you never reached an agreement on the land or the equipment, true?

Richard:    That's right.

[¶44.]    Aside from the findings related to the $60,000 check, the circuit court additionally found that "Richard delivered a second check to Gloria on December 30,

-19-

2004 representing the remaining interest in the cattle." This finding is also clearly erroneous to the extent it implies that some other agreement relating to the calves and bulls had been reached. Gloria testified that after she returned the $60,000 check in May 2004, she heard nothing from Richard for several months. She testified that in December 2004, she and Richard were together moving furniture out of their mother's apartment and he made no mention of the check she had returned. Then later that same day, he left the $60,000 check, along with another check purportedly for bulls and calves, at Gloria's home when she was not there. She never accepted either check and did not find out until later that Richard believed she had sold him her cattle.

[¶45.]    When relating what had occurred the day Richard left the returned check and this second check at her home, Gloria noted, in her 2008 letter to Richard, that they had never discussed her ownership interest in the calves and bulls and that she had no input as to the amount paid for them. She also noted that the first time Richard indicated that he thought she had sold her cattle to him was at a meeting in January 2008. Richard did not provide testimony or evidence refuting these claims.

[¶46.]    Other documentation admitted at trial supports Gloria's claim that she had not agreed to separately sell her cattle in 2003 or 2004 to Richard. In a proposal Gloria provided to Richard in December 2008 for how the Estate Property could be partitioned, the section relating to the personal property that needed to be divided contains the following language: "Gloria agrees to sell eighty head of cattle for a sum of $60,000.00. In exchange for her interest in calves and bulls, Gloria

acquires 80 additional acres of the 120 Harding County, South Dakota real estate giving her sole ownership of this property." Richard's son, Jeff, took notes of a family meeting in January 2009 regarding this proposal. The meeting minutes include a discussion about Gloria's suggestion that she receive this Harding County property in exchange for her share of the calves and bulls. The notes state that Richard asked Gloria why she was interested in this property, and she responded that it would be a way to settle the cattle issue which has tax implications for her. Richard then commented that he had never traded real estate for personal property, and when Jeff asked him if he would ever consider it, Richard stated he did not like the idea. Notably, there was no mention in these minutes that Richard had already purchased eighty head of cattle from Gloria or her share of the calves and bulls.

[¶47.] The majority opinion generally notes some of the evidence in the record supporting Gloria's position and states that the circuit court "was required to weigh the conflicting testimony and evidence." But on the discrete topic of the purported cattle sale, there was no conflicting testimony. Neither Gloria nor Richard testified that Gloria agreed to sell her interest in the cattle in the absence of a global agreement to purchase her entire interest, or otherwise divide their respective interests, in the Estate Property. In fact, the evidence points only to the opposite conclusion.

[¶48.] Based on my review of the trial record in its totality, I am "left with the definite and firm conviction that a mistake has been committed." *Fuoss v. Dahlke Fam. Ltd. P'ship*, 2023 S.D. 3, ¶ 22, 984 N.W.2d 693, 701 (citation omitted). I would therefore reverse the circuit court's determination that Gloria had agreed to sell her

interest in the cattle separate from the rest of her 1/3 interest in the estate, and remand for further proceedings to adjust the division of the Estate Property accordingly.

[¶49.]     SALTER, Justice, joins this writing.